UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY

| UNITED STATES DISTRICT COURT | MIDDLE DISTRICT OF FLORIDA |
|---|---|
| Name: **JOHN C. GIOVANETTI** | Case No. 8:09-CV-2626-T-27MAP |
| Place of Confinement: **FPC Montgomery, Maxwell Air Force Base, Montgomery, AL 36112** | Prisoner No.: 93309-020 |

**UNITED STATES OF AMERICA V. JOHN C. GIOVANETTI**

**MOTION**

1.    (a) Name and location of court that entered the judgment of conviction you are challenging:

    **U.S. District Court, Middle District of Florida (Tampa)**

    (b) Criminal docket or case number: **8:07-CR-295-T-27MAP**

2.    (a) Date of judgment of conviction: **May 20, 2008.  (Second Amended Judgment)**

    (b) Date of Sentencing: **May 12, 2008.**

3.    Length of sentence:  **60 months (count 1); 135 months (counts 2-9), consecutive; 135 months (counts 11-13), consecutive; 135 months (counts 14-21), consecutive; 135 months (counts 23-25), consecutive; 36 months s/r counts 1-9 and 11-13, 60 months s/r counts 14-21 and 23-25 (11 years and 3 months imprisonment total).**

4.    Nature of crime (all counts):

    **Count 1: Conspiracy to Commit Wire Fraud and Bank Fraud - 18 U.S.C. § 371**
    **Counts 2-9, 11-13: Wire Fraud - 18 U.S.C. § 1343**
    **Counts 14-21, 23-25: Bank Fraud - 18 U.S.C. § 1344**

5.    What was your plea?  (Check one)
    (a) **Not guilty** ■    (b) Guilty  ☐    c) Nolo contendere (no contest)  ☐

(b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to? **N/A**

6. If you went to trial, what kind of trial did you have?  (Check one) **Jury** ■ Judge Only □

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?  **Yes** ■ No □

8. Did you appeal from the judgment of conviction? **Yes** ■ No □

9. If you did appeal, answer the following:

   (a) name of court:  **U.S. Court of Appeals for the Eleventh Circuit**

   (b) Docket or case number (if you know):  **08-12945-GG**

   (c) Result:  **Dismissed.**

   (d) Date of result (if you know):  **October 3, 2008.**

   (e) Citation of the case (if you know):

   (f) Grounds raised:  One – Conviction obtained by the unconstitutional use of perjured testimony by the prosecution.  Two – Denial of effective assistance of counsel.

   (g) Did you file a petition for certiorari in the United States Supreme Court? **Yes** □      No ■

   If yes, answer the following:

      (1) Docket or case number (if you know): **N/A.**

      (2) Result: **N/A.**

      (3) Date of result (if you know):  **N/A.**

      (4) Citation to the case (if you know):  **N/A**.

      (5) Grounds raised:  **N/A.**

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

2

Yes  ☐      **No**  ■

11.  If your answer to question 10 was "Yes," give the following information: **N/A.**

    (a)    (1) Name of the Court: **N/A.**

        (2) Docket or case number (if you know): **N/A.**

        (3) Date of fling (if you know): **N/A.**

        (4) Nature of the proceeding: **N/A.**

        (5) Grounds raised: **N/A.**

        (6) Did you receive a hearing where evidence was given on your motion, petition, or application?
            Yes  ☐   No   ☐  **N/A.**

        (7) Result: **N/A.**

        (8) Date of result (if you know): **N/A.**

    (b) If you filed any second motion, petition, or application, give the same information: **N/A.**

        (1) Name of Court: **N/A.**

        (2) Docket or case number (if you know): **N/A.**

        (3) Date of filing (if you know): **N/A.**

        (4) Nature of the proceeding: **N/A.**

        (5) Grounds raised: **N/A.**

        (6) Did you receive a hearing where evidence was given on your motion, petition, or application?

            Yes  ☐  No ☐   **N/A.**

        (7) Result: **N/A.**

(8) Date of result (if you know): **N/A.**

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application? **N/A.**

    (1) First Petition: Yes ☐    No ☐   **N/A.**

    (2) Second petition: Yes ☐ No ☐  **N/A.**

(d) If you did not appeal from the action on any motion, petition or application, explain briefly why you did not: **N/A.**

12.    For this motion, state every ground on which you claim that you are being held in violation of the Constitution laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

GROUND ONE:

**Conviction obtained by the unconstitutional use of perjured testimony by the prosecution.**

    (a)    Supporting facts (Do not argue or cite law). Just state the specific facts that support your claim):

**In violation of the Defendant's Fifth Amendment due process rights, the government used the testimony of Lisa Agnew that was perjured, as was shown by the documents produced by the government. The documentary evidence in the possession of the government reflected that Lisa Agnew, a witness for the government, was committing perjury when she testified that she only completed one funding form on which she wrote the false information regarding a "re-floored vehicle" when, in fact, Lisa Agnew had placed re-floored vehicle on several funding forms. This was in addition to the forms on which she entered the non-fraudulent vehicle information, to which Scott Littlejohn then added re-floored vehicles and which Lisa Agnew, in some cases, faxed to SunTrust Bank with knowledge of the fraudulent information. Further, the documentary evidence reflected that, contrary to the direct testimony of Lisa Agnew, only funding forms with non-fraudulent information were faxed to SunTrust during the so-called honeymoon period. Lisa Agnew testified she faxed the only funding form on which she had entered fraudulent information during this period and only after Defendant purportedly instructed her to "go to the closet," said to be code for the fraudulent re-flooring scheme.**

4

(b)     Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction did you raise this issue?
Yes ☐  **No ■**

(2) If you did not raise this issue in your direct appeal, explain why: **Defendant did not know specifically what testimony of Lisa Agnew was perjured because of the failure of defendant's counsel to review the documentation supplied by the government. Therefore, it was not known by defendant that perjured testimony had been used in his trial. Further, appellate courts will not consider claims of ineffective assistance of counsel raised on direct appeal unless the record is sufficiently developed.** *United States v. Bender,* **290 F.3d 1279, 1284 (11th Cir. 2002),** *citing, United States v. Camacho,* **40 F.3d 349, 355 (11th 1994),** *cert. denied,* **514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735(1995).**

(c)     Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?
**Yes**   ☐      No ■

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: **N/A.**

Name and location of the court where the motion or petition was filed: **N/A.**

Docket or case number (if you know):  **N/A.**

Date of the court's decision: **N/A.**

Result (attach a copy of the court's opinion or order, if available):  **N/A.**

(3) Did you receive a hearing on your motion, petition, or application?
**Yes**   ☐      No   ☐      **N/A.**

(4) Did you appeal from the denial of your motion, petition, or application?
Yes   ☐      **No**   ☐      **N/A.**

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?:
Yes   ☐      **No**   ☐      **N/A.**

(6) If your answer to Question (c)(4) is "Yes," state:

5

Name and location of the court where the appeal was filed: **N/A**

Docket or case number (if you know): **N/A**

Date of the court's decision: **N/A**

Result (attach a copy of the court's opinion or order, if available): **N/A**

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: **N/A.**

GROUND TWO:

**Denial of effective assistance of counsel.**

(a)       Supporting facts (Do not argue or cite law). Just state the specific facts that support your claim):

**A.       Counsel for the Defendant, John M. Fitzgibbons ("Fitzgibbons") failed to introduce evidence that Lisa Agnew, a witness for the government, was committing perjury when she testified that she only completed one funding form on which she wrote the false information regarding a "re-floored vehicle" when, in fact, Lisa Agnew had placed re-floored vehicle on several funding forms. This was in addition to the forms on which she entered the non-fraudulent vehicle information, to which Scott Littlejohn then added re-floored vehicles and which Lisa Agnew, in some cases, faxed to SunTrust Bank with knowledge of the fraudulent information. Further, Fitzgibbons failed to introduce evidence that only funding forms with non-fraudulent information were faxed to SunTrust during the so-called honeymoon period. Lisa Agnew testified she faxed the only funding form on which she had entered fraudulent information during this period and only after defendant purportedly instructed her to "go to the closet," said to be code for the fraudulent re-flooring scheme. *See,* the Handwriting Analysis attached to Defendant's Memorandum of Law in Support of Motion Pursuant to 28 U.S.C. § 2255.**

**B.       Fitzgibbons failed to follow-up on information that would have impeached the credibility of Scott Littlejohn, the accounting manager for Big Oaks Buick Pontiac ("BOBP"), the auto dealership owned by the Defendant. This information was that Littlejohn's computer at BOBP had child pornography on it and that a criminal investigation of those images had been begun by the Polk County Sheriff's Office. In fact, Fitzgibbons, although well aware of this information, merely asked the Defendant "if you know**

6

anything about any of these matters and if we should pursue any of them."
(Fitzgibbons letter of 29 Nov 2008).

C.      Fitzgibbons failed to subpoena or otherwise obtain the
accounting records and hard drive images from the Reynolds and Reynolds
accounting system that had been installed at BOBP. (Fitzgibbons knew this
information was available from Reynolds and Reynolds, the Ackerman
Senterfitt law firm in Orlando, and the FBI.) These images would have
disclosed any fraudulent or inappropriate financial dealings by Kelly Roth
(the General Manager of BOBP) and Scott Littlejohn. Such information
would have been useful in impeaching the credibility of Roth and Littlejohn.
Further, such information would be critical to allow Lisa Blackburn (an
automotive accounting expert engaged by the Defendant with respect to this
Section 2255 Motion) to properly review the accounting work done at BOBP
in order to confirm or dispute her suspicion that Roth and Littlejohn were
hiding other fraudulent activities. (See, Affidavit of Lisa Blackburn,
attached to Defendant's Memorandum of Law in Support of Motion
Pursuant to 28 U.S.C. § 2255.)

D.      Fitzgibbons failed to put on testimony from Deb Cheney, the
former accounting manager at BOBP and the immediate predecessor to Scott
Littlejohn) and other witnesses that would counter the testimony of Roth,
Littlejohn, Lisa Agnew, and Tammy Burton (an accounting clerk at BOBP)
that the Defendant knew of the re-flooring scheme.

E.      Fitzgibbons failed to develop on cross examination the fact that
Tammy Burton was inconsistent in her testimony as to whether she ever
heard the Defendant direct her or Agnew to "go to the closet" and re-floor
vehicles on funding forms sent to SunTrust Bank.

F.      Fitzgibbons failed to make clear to the jury that Agnew and
Burton both failed to recount to the FBI and FDLE agents during the
investigation that led to the indictment of the Defendant that the Defendant
had supposedly instructed them to re-floor vehicles during September 2004
when both Roth (vacation) and Littlejohn (honeymoon) were absent from
BOBP. Further, Fitzgibbons failed to impeach the testimony of the
government witnesses, especially Lisa Agnew, that the funding forms from
the "honeymoon period" could not be located, when such documents were in
the possession of the government and were also in the possession of
Fitzgibbons during the trial. Those documents disclosed no re-flooring of
vehicles during the "honeymoon period" contrary to the testimony of Lisa
Agnew.

7

G.     Fitzgibbons failed to develop and emphasize to the jury that Roth testified that SunTrust's Craig Hutchinson was the person that purportedly "instructed" the BOBP accounting department to backdate documents in order to not appear to be "out of trust" and did not testify that Hutchinson or anyone else told this to the Defendant. From this Fitzgibbons should have argued that any fraudulent schemes were most likely hatched within the accounting department under the direction of General Manager Roth and without the Defendant's knowledge, including the re-flooring scheme. Fitzgibbons should also have introduced the testimony of James Meyer, corporate attorney for BOBP, that Roth told Meyer that Craig Hutchinson of SunTrust had instructed Roth on how to re-date and re-floor the vehicles.

H.     Fitzgibbons failed to cross examine Kenneth Rosenfield, the receiver appointed for BOBP, or otherwise elicit testimony that no financial records reflected significant funds going from BOBP to the Defendant (and no action was taken in the bankruptcy proceeding later filed with respect to BOBP to retrieve assets or monies from the Defendant that would have been deemed preferential) and, further, that Roth had just as high or higher lifestyle as the Defendant, so that it was unlikely that the Defendant developed or approved the re-flooring scheme in order to steal funds from SunTrust through BOBP.

I.     Fitzgibbons misstated evidence and, as a result, wrongly placed emphasis during his closing argument on the contention that Roth testified that Littlejohn's wedding was in 2003, but Agnew testified that she didn't learn of the re-flooring scheme until 2004. In attempting to challenge the credibility of key government witnesses who were employees of BOBP, Fitzgibbons mistakenly stated that the Littlejohn wedding was in 2003, not 2004 as testified to by Lisa Agnew. However, the wedding, as other government witnesses from BOBP testified, was in 2004, just weeks before the receiver took over BOBP. Assuming the jurors kept good notes and remembered the testimony, Fitzgibbons' mistake would undercut his argument. Further, in his closing, Fitzgibbons spent a good deal of time suggesting that Agnew and Burton should not have been retained by the receiver, and could have used that period of employment to selectively pick-out what they wanted the government to see.

J.     Fitzgibbons failed to deal in his closing with whether the meeting between Agnew, Burton, and the Defendant during the honeymoon/vacation period even occurred or why the Defendant acted as he did when the three SunTrust officials came to BOBP to audit the records after the re-flooring scheme had been discovered.

8

**K.** **Fitzgibbons failed to attack the credibility of Roth as it related specifically to his testimony that the first time the Defendant acknowledged awareness of "going to the closet" was when Agnew told Roth she was uncomfortable with re-flooring, so that Roth and Agnew went together and met with the Defendant. (On 12 May 2008, the judge recounted this as supporting Roth as a credible witness.) However, Agnew testified that the first and only time she heard the Defendant say anything that reflected his knowledge of the re-flooring scheme was in September 2004 when Agnew and Burton went to the Defendant for direction on how to cover a shortfall (during the honeymoon/vacation period when both Roth and Littlejohn were not at BOBP) and the Defendant supposedly told them to "go to the closet."**

**L.** **Fitzgibbons failed to introduce the testimony of Ira Silver, CPA for BOBP regarding the irregular accounting methods used by Littlejohn and that such irregularities could be part of a plan to cover-up financial wrongdoings by Roth and Littlejohn.**

**M.** **Fitzgibbons failed to be prepared for trial, having only met with the Defendant one time for the purpose of preparing for the trial of this matter. That single time was the weekend prior to the trial starting on Monday**

(b)   Direct Appeal of Ground Two:

(1) If you appealed from the judgment of conviction did you raise this issue? Yes ☐  **No ■**

(2) If you did not raise this issue in your direct appeal, explain why: **Generally, appellate courts will not consider claims of ineffective assistance of counsel raised on direct appeal unless the record is sufficiently developed.** *United States v. Bender*, **290 F.3d 1279, 1284 (11th Cir. 2002),** *citing, United States v. Camacho,* **40 F.3d 349, 355 (11th 1994),** *cert. denied,* **514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735(1995).**

(c)   Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application? **Yes   ■       No** ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: **Motion for New Trial.**

Name and location of the court where the motion or petition was filed: **United States District Court, Middle District of Florida, Tampa Division.**

Docket or case number (if you know):  **8:07-CR-295-127-MAP.**

Date of the court's decision: **May 16, 2008.**

Result (attach a copy of the court's opinion or order, if available):  **Denied.**

(3) Did you receive a hearing on your motion, petition, or application?
**Yes**    ■        No      □

(4) Did you appeal from the denial of your motion, petition, or application?
Yes    □        **No**     ■

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?:
Yes    □        **No**     ■

(6)  If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: **N/A.**

Docket or case number (if you know): **N/A.**

Date of the court's decision: **N/A.**

Result (attach a copy of the court's opinion or order, if available): **N/A.**

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: **Generally, appellate courts will not consider claims of ineffective assistance of counsel raised on direct appeal unless the record is sufficiently developed.** *United States v. Bender,* **290 F.3d 1279, 1284 (11th Cir. 2002),** *citing, United States v. Camacho,* **40 F.3d 349, 355 (11th 1994),** *cert. denied,* **514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735(1995).**

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

**Yes. Claims of use of perjured testimony (not known to Defendant when post-trial motion and appeal were filed) and ineffective assistance of counsel (such a claim is generally not properly raised on direct appeal).**

14. Do you have any motion, petition, or appeal <u>now</u> pending (filed and not decided yet) in any court for the judgment you are challenging Yes ☐   **No ■**

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. **N/A.**

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

    (a) At preliminary hearing: **John M. Fitzgibbons, The Law Offices of John M. Fitzgibbons, Tampa Theatre Building, Suite 700, 707 North Franklin Street, Tampa, Florida 33602-4441.**

    (b) At arraignment and plea: **Same as 15(a).**

    (c) At trial: **Same as 15(a).**

    (d) At Sentencing: : **Harrison T. Slaughter, Jr., Leventhal & Slaughter, LLP, 111 N. Orange Avenue, Suite 700, Orlando, Florida 32801.**

    (e) On Appeal: **Same as 15(d).**

    (f) On Petition for Writ of Certiorari to the U.S. Supreme Court: **N/A**

    (f) In any post-conviction proceeding: **Hearing on Defendant's Motion for New Trial, same as 15(d).**

    (g) On appeal from any ruling against you in a post conviction proceeding: **N/A**

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time? **Yes ■**      No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes ☐   **No ■**

    (a) If so, give name and location or court that imposed the other sentence you will serve in the future: **N/A**

    (b) Give the date the other sentence was imposed: **N/A**

(c) Give the length of the other sentence: **N/A**

(d) Have filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes   ☐   No   ☐   **N/A**

18.  TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

**The judgment of conviction became final 90 days after the Eleventh Circuit Court of Appeals issued in mandated on October 3, 2008, or January 1, 2009.**

*The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of –
(1) the date on which the judgment of conviction became final;
(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

WHEREFORE, in light of the foregoing, John C. Giovanetti respectfully requests that the Court grant the following relief:

**That the Court set aside John C. Giovanetti's conviction and the sentence imposed, that John C. Giovanetti be released from custody and that John C. Giovanetti be granted a new trial.   Finally, that the Court grant John C. Giovanetti any other relief to which he may be entitled.**

RESPECTFULLY SUBMITTED, this **29th** day of December 2009.

Florida Bar No. 194822
Leventhal & Slaughter, LLP
111 N. Orange Avenue, Suite 700
Orlando, Florida  32801
Telephone No. (407) 849-6161
Fax No. (407) 843-3738
E-mail:  butch@leventhal-slaughter.com

declare under penalty of perjury that the foregoing is true and correct.

Executed on ___Dec 21___, 2009.

_____
John C. Giovanetti, Movant

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
          **Plaintiff,**              **CASE NO.**    **8:07-CR-295-127-MAP**

v.

JOHN C. GIOVANETTI,
          **Defendant.**
_____/

## MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER 28 U.S.C. 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

### Prefatory Statement

In his Section 2255 Motion, John C. Giovanetti (hereinafter "Defendant") asks that this Court set aside his conviction and grant him a new trial based on the fact that he was convicted by the use of perjured testimony and was also denied effective assistance of counsel. Defendant respectfully submits that the testimony of a key government witness, Lisa Agnew, was false in material respects and such false testimony was known by the prosecution to be false. Further, such false testimony, in all reasonable likelihood, affected both the judgment of the jury in its determination of Defendant's guilt, as well as the judgment of this Court in making a specific finding that Defendant had obstructed justice by giving perjured testimony in his own defense. Defendant also respectfully submits that his trial counsel failed in his legal and ethical obligations to Defendant to the point that Defendant was denied the effective assistance of counsel. Both of these constitutional violations required the Court to vacate its sentence of Defendant and grant Defendant a new trial on the charges against him.

### History of Proceedings

On August 3, 2007, Defendant was arrested and charged by indictment with multiple

1

counts of bank fraud and wire fraud, as well as with conspiracy to commit bank fraud and wire fraud, in violation of 18 U.S.C. §§371, 1343-44.  (Dkt. 1)  The jury trial in this matter began on February 4, 2008.  At trial, the only defense witness was Defendant.  Defendant was found guilty of all counts of the Indictment (other than counts 10 and 22 which had been dismissed prior to trial) on February 11, 2008.  Defendant was sentenced by this Court on May 12, 2008 to 60 months of imprisonment on the conspiracy count and 135 months of imprisonment on each of the bank and wire fraud counts, to run concurrently.  After imprisonment, Defendant must serve five years of supervised release.  Defendant was also ordered to pay an assessment of $2,300.00 and restitution of $1,066,851.90.  Finally, this Court entered a forfeiture money judgment (jointly and severally against Defendant and two indicted co-conspirators – Kelly Roth and Scott Littlejohn – in the amount of $3,654,653.00).  (Dkt. 80)

On September 8, 2008, Defendant began serving his prison sentence at FPC Montgomery, Maxwell Air Force Base, Montgomery, Alabama, where Defendant remains in confinement at the present time.

### The Law Regarding Use of Perjured Testimony, Ineffective Assistance of Counsel, and Right to Obtain a Hearing and Discovery Upon a Section 2255 Motion

*A. Use of Perjured Testimony*

A criminal defendant's Fifth Amendment due process rights are violated "when the prosecution . . . knowingly uses false evidence or 'allows it to go uncorrected,' *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959), even where the evidence 'goes only to the credibility of the witness' because the jury's estimation of that witness's reliability may be determinative of the defendant's guilt. *Id.* at 269, 79 S.Ct. at 1177." *Carr v. Schofield,* 364 F.3d 1246, 1254 (11th Cir. 2004).  The Eleventh Circuit Court of Appeals continued in *Carr*

A conviction obtained by the knowing use of false or perjured testimony, including testimony that reflects on the credibility of the witness, will "be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," . . . Perjured testimony "is considered material unless failure to disclose it would by harmless beyond a reasonable doubt." [*United States v. Bagley*, 473 U.S. 667, 678-679, 682, 105 S.Ct. 3375, 3382-83, 87 L.Ed.2d 481 (1985)] at 680, 105 S.Ct. at 3382. . . . Evidence that a witness has lied under oath is "direct proof" that the witness might alter the truth for his own benefit, *United States v. Bernal-Obeso*, 989 F.2d 331, 336 (9th Cir.1993), and can provide "the assault that was warranted" on the witness's testimony instead of limiting the defense to inconsistencies in testimony as grounds for impeachment. *Kyles*, 514 U.S. at 443 n. 14, 115 S.Ct. at 1570 n. 14. "[W]here the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony," the testimony is considered material " 'if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the jury' " *United States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995) (alteration in original) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)).

*Carr*, at 1254-55.

*B.  Ineffective Assistance of Counsel*

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense . . ." U.S. Const. Amend. VI. This right was designed to assure fairness in the adversary criminal process. *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697-98, 100 L.Ed.2d 140 (1988). As such, in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic*, 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984).

It is axiomatic that the representation of a criminal defendant entails certain basic duties. Defense counsel's function in a criminal case is to assist the defendant, and "[f]rom counsel's function as assistant to the defendant ***derive the overarching duty to advocate the defendant's***

3

*cause* . . . ." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065 (1984). (emphasis added).   Thus, the right to counsel encompasses more than merely having an attorney appointed or present throughout a criminal proceedings.  Instead, it entitles a defendant to effective representation of counsel at each critical stage of the criminal process.  *Id.*

As such, the accused in a criminal case is entitled to reasonably competent counsel whose advice is within the range of competence demanded of attorneys in criminal cases.  *Strickland, supra,* 466 U.S., at 687, 104 S.Ct., at 2064.  The right to the effective assistance of counsel is the right of the accused to force the prosecution's case to survive the crucible of a meaningful adversarial testing.  *Id.*

As a general matter, a criminal defendant claiming a denial of effective assistance of counsel in violation of the Sixth Amendment usually must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.*, 466 U.S., at 686, 104 S.Ct. at 2064. And while tactical or strategic decisions by defense counsel are generally not enough to establish ineffective assistance of counsel, *Id.*, 466 U.S., at 689, 104 S.Ct. at 2065, the mere incantation of the word "strategy" does not insulate attorney behavior from review. *Cave v. Singletary,* 971 F.2d 1513, 1518 (11th Cir. 1992). Instead, the attorney's choice of tactics must be *reasonable* under the circumstances. *See, Chandler v. United States,* 218 F.3d 1305, 1315-16 (11th Cir. 2000)(when determining claim of ineffective assistance of counsel, court looks at acts or omissions of counsel that defendant alleges are unreasonable and asks whether a reasonable lawyer could have conducted trial in that manner), *cert. denied,* 531

U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001). Whether a specific tactical decision was

reasonable is reviewed *de novo* as a question of law. *Id.; Conklin v. Shofield,* 366 F.3d 1191,

1202 (11th Cir. 2004 ), *cert. denied,* 544  U.S. 952, 125 S.Ct. 1703, 161 L.Ed.2d 531 (2005).

It is acknowledged that courts must "indulge [the] strong presumption" that counsel's

performance was reasonable and that counsel "made all significant decisions in the exercise of

reasonable professional judgment." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *accord*

*Williams v. Head,* 185 F.3d 1223, 1227-28 (11th Cir.1999). The burden to overcome the

presumption is a heavy one, but not insurmountable-is a heavy one. *Kimmelman v. Morrison,*

477 U.S. 365, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986); *see also Williams,* 120 S.Ct. at

1511.  When counsel is experienced, the presumption that his conduct was reasonable is even

stronger.  *See Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir.1998) (stating that

"strong reluctance to second guess strategic decisions is even greater where those decisions were

made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is,

the more likely it is that his decision to rely on his own experience and judgment in rejecting a

defense" is reasonable); *see also Burger,* 107 S.Ct. at 3118 (reciting counsel's impressive

credentials in opinion finding that counsel rendered effective assistance).  *See also, Chandler,*

*supra.*

To establish ineffective assistance, a defendant must provide factual support for his

contentions that he received ineffective assistance in his defense from his counsel. *Smith v.*

*White,* 815 F.2d 1401, 1406-07 (11th Cir.), *cert. denied,* 484 U.S. 863, 108 S.Ct. 181, 98 L.Ed.2d

133 (1987). "Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the

*Strickland* test. *Wilson v. United States,* 962 F.2d 996, 998 (11th Cir.1992); *Tejada v. Dugger,*

941 F.2d 1551, 1559 (11th Cir.1991); *Stano v. Dugger,* 901 F.2d 898, 899 (11th Cir.1990) (citing

*Blackledge,* 431 U.S. at 74, 97 S.Ct. at 1629); *United States v. Ross,* 147 Fed.Appx. 936, 939

(11th Cir.2005)." *United States v. West,* 2008 WL 4186998 *5 (N.D. Fla. 2008).

*C.  Right to a Hearing and Discovery Upon Section 2255 Motion.*

      Pursuant to Rule 6(a) of the rules governing proceedings under 28 U.S.C. § 2255, the

court may authorize a party to conduct discovery under the Federal Rules of Criminal Procedure

or Civil Procedure if good cause is shown.  Further, Rule 8(a) provides that, if the Section 2255

motion is not dismissed (pursuant to Rule 4(b)), the court must review the motion, answer,

transcripts and records of prior proceedings, and any additional material to determine if an

evidentiary hearing is warranted.

> A § 2255 movant seeking discovery must show good cause. 28
> U.S.C. § 2255 Rule 6(a); *Phelps v. U.S.,* 2007 WL 2109244 at *10
> (E.D.Tenn. July 18, 2007) (unpublished). That can be shown where
> specific allegations support reason to believe that the movant may,
> if the facts are fully developed, be able to demonstrate that he is
> entitled to relief. *U.S. v. Roane,* 378 F.3d 382, 402-03 (4th
> Cir.2004). And when an evidentiary hearing also is sought, courts
> must conduct one
>
> "unless the motion and the files and records of the case
> conclusively show that the prisoner is entitled to no relief." 28
> U.S.C. § 2255; *see also Anderson v. United States,* 948 F.2d 704,
> 706 (11th Cir.1991) (holding that, unless the record is adequate to
> show conclusively that the movant's contentions are without merit,
> the district court must conduct a hearing). On review, the court
> "must accept all of the petitioner's alleged facts as true and
> determine whether the petitioner has set forth a valid claim." *Diaz
> v. United States,* 930 F.2d 832, 834 (11th Cir.1991) (quotation
> omitted). However, "on habeas a federal district court need not
> conduct an evidentiary hearing if it can be conclusively determined
> from the record that the petitioner was not denied effective
> assistance of counsel."
>
> *Paez-Ortiz v. U.S.,* 200 Fed.Appx. 946, 948 (11th Cir.2006); *see
> also Tucker v. U.S.,* 275 Fed.Appx. 402, 404 (5th Cir.2008).

*Brown v. United States,* 583 F.Supp.2d 1330, 1336 (S.D. Ga. 2008) (footnote omitted).

To obtain discovery and a hearing on his Section 2255 motion, a movant must provide specific allegations lending support to his claims. *See Bracy v. Gramley*, 520 U.S. 899, 908-09, 117 S.Ct. 1793 (1997); *see also McDaniel v. United States District Court ("Jones")*, 127 F.3d 886, 888 (9th Cir.1997) (good cause for discovery found where petitioner's claims did not appear purely speculative, each claim included factual allegations, and materials sought through discovery were not available from petitioner's appellate counsel); *Jones v. Wood*, 114 F.3d 1002, 109-10 (9th Cir. 1997) (good cause found where petitioner identified specific material he needed to argue effectively that trial lawyer had rendered ineffective assistance).

## Facts Related to Defendant's Perjured Testimony and Ineffective Assistance of Counsel Claims

During the sentence proceedings held on May 12, 2008, this Court declared that one of the government's key witnesses, Lisa Agnew, "was, in my judgment, an excellent witness. She described the incident when Mr. Roth was on vacation and Mr. Littlejohn was getting married, and Littlejohn had explained to her how to, as she said, do it, told her how to do it if they needed cash, meaning going to the closet. That was when the phrase was first discussed." (Tr. May 12, 2008, pp. 18:24 to 19:5) Later in the hearing, this Court stated: "In this case, however, the testimony of Lisa Agnew was expressly denied by Mr. Giovanetti. I think that the evidence supports a finding, and I do find, that with respect to that specific denial, that was untruthful." (Tr. May 12, 2008, p. 22:14-18)

As this Court began to announce its sentence, the Court foreshadowed the situation Defendant now confronts:

> The finding of perjury troubles me because our system is premised on an oath. And I would be as troubled, Mr. Giovanetti, if it were established to my satisfaction that any of those witnesses who testified on behalf of the government perjured themselves as much

7

as I am your perjury.  And that's why I made the notation I did as
the testimony was presented, so that if I get to the point, as I have
today, of having to make a very difficult determination, I am
comfortable that I'm making the correct one.

If it turns out somehow, someway that Edward Littlejohn and Mr.
Roth and Tammy Burton and Lisa Agnew all lied under oath and
you have been wrongly convicted, I would not hesitate to enter an
appropriate order.  I don't think that's the case.  But I want you to
understand the importance I place, on testimony under oath in this
courtroom.

(Tr. May 12, 2008, pp. 37:9 to 38:1)

During her direct testimony, Lisa Agnew, who worked in the accounting department of

Big Oaks Buick Pontiac ("BOBP"), spoke of how she and fellow accounting department

employee Tammy Burton had originally boxed and readied for transportation to storage the

records of BOBP after the appointment of the BOBP receiver. Ms. Agnew spoke of how she and

Tammy had, at the government's direction, retrieved certain documents from storage as the case

against Defendant was being investigated, and how she had reviewed the retrieved documents

related to the case against Defendant. Ms. Agnew also testified in detail about the so-called "re-

flooring" scheme, by which certain vehicles that had been previously sold and were no longer

owned by BOBP were included on "funding forms" sent to SunTrust Bank, the financial

institution that provided BOBP with its floor plan financing. By inclusion of these "re-floored"

vehicles on the funding forms, BOBP was able to borrow more money than it was otherwise

entitled to obtain pursuant to its agreements with SunTrust. (Tr. Feb. 5, 2008, pp. 209-224)

Critical to the case against Defendant, Ms. Agnew testified about a meeting that purportedly

occurred in September 2004. According to Ms. Agnew, during the first part of September 2004,

both Mr. Roth and Mr. Littlejohn were absent from BOBP and it was up to Ms. Agnew and Ms.

Burton to ensure that BOBP had enough money to operate. Having purportedly checked all

regular sources of funding for BOBP, Ms. Agnew testified that she and Ms. Burton approached

Defendant and told him of the get for additional funds. Ms. Agnew said in response to their

telling Defendant about their attempts to get additional funds and those funds still being needed

that Defendant told them to "go to the closet." Ms. Agnew testified it was understood by that

statement from Defendant that he was directing Ms. Agnew and Ms. Burton to re-floor

previously sold vehicles, the information about which was contained in the storage closet in the

accounting department office at BOBP.  (Tr. Feb. 5, 2008, pp. 233-36.)

Mr. Agnew then testified she did, in fact, go to the closet as directed by Defendant, filled

out a funding form, faxed it to SunTrust, and obtained additional funds for BOBP. (Tr. Feb. 5,

2008, pp. 238:17 to 239:6.) Lisa Agnew also testified that is one instance in September 2004 was

the only instance in which she was aware that Defendant knew of the false claims being made to

SunTrust pursuant to the re-flooring scheme. (Tr. Feb. 5, 2004, p. 239:7-12.)

On cross examination, Defendant's trial counsel, John M. Fitzgibbons, had Ms. Agnew

first confirm that of all of the exhibits introduced by the government in its case against

Defendant that related to the re-flooring scheme, only one (Gov't. Exh. 2) had her handwriting.

(Tr. Feb. 6, 2008, 1st vol., p. 10:8-17.) Exhibit 2 was a funding form on which Ms. Agnew had

entered four non-fraudulent vehicles, to which Mr. Littlejohn later added re-floored vehicles.

Ms. Agnew then testified that she wrote information regarding fraudulent or "fake" cars on one

funding form in September 2004.  (Tr. Feb. 6, 2008, 1st vol., p. 11:15-23.)  Finally, Mr.

Fitzgibbons asked and Ms. Agnew responded as to a critical fact:

> Q.     Then how many times did you complete a funding form in
> which you placed on the funding form false information in your
> own handwriting?
> A.     I did it one time in September of '04.
> Q.     That's the only time?
> A.     To my knowledge that I remember, yes.

Q.    Do you have that funding form?

A.    No, I don't.

Q.    Did you look for it?

A.    It was not in the stuff that we had.

Q.    You've been to the warehouse with the agents going through everything, as I understand, and we'll get to that in a little bit: is that correct?

A.    That is correct.

(Tr. Feb. 6, 2008, 1st vol., p. 14:1-14)

Q.    Okay.  Now, in addition to this one conversation in September of '04, again, his-voice-to-your-ear direct knowledge, what other instances do you have?

A.    None from him.

Q.    Okay.  Now, Tammy Burton who was with you that day, to your knowledge, did she go to the closet and pull these files that were refunded or refinanced?

A.    Tammy and I went together.

Q.    To pull the file jackets?

A.    Yes.

Q.    So you went to the closet?

A.    Yes.

Q.    Is your testimony now you went to the closet and pulled records?

A.    Yes, I did.

Q.    All right.  Now, how many times did you go to the closet and pull records?

A.    Just one.

Q.    Just that one time.  How many times did Tammy Burton, to your knowledge, pull files?

A.    Just that one time, to my knowledge.

(Tr. Feb. 6, 2008, 1st vol., pp. 21:18 to 22:13)

So, according to Ms. Agnew, one of the most important witnesses in the government's case and the one that led this Court to find that Defendant had committed perjury, testified that she **once** when "to the closet" and wrote the information related to fake or fraudulent vehicles on **one** funding form, and she recalls the details of that specific instance because it is coupled with the **only** occasion during which she knew of Defendant's purported knowledge of the re-flooring scheme – by his use of the phrase "go to the closet." Further, Ms. Agnew and Ms. Burton, both

unindicted co-conspirators in this matter, testified that they were unable to locate the funding form relating to this singular occasion on which Ms. Agnew, with the assistance of Ms. Burton, completed a false funding form and sent it to SunTrust. Mr. Donald Hansen, the prosecutor, told the jury during his opening statement that they would hear from Ms. Agnew and Ms. Burton about the time they completed a funding form when Mr. Littlejohn was not around to do so and after interacting with Defendant (Tr. Feb. 5, 2008, p. 22:11-17.) During Mr. Hansen's closing, he reminded the jury that they had heard from Ms. Agnew about what she had done in furthering the illegal re-flooring scheme (Tr. Feb. 11, 2008, p. 17:6-16.) Finally, arguing that Defendant had established a buffer between himself and the actual steps of the re-flooring scheme, Mr. Hansen claimed that the buffer failed because the "ladies that are actually working in the accounting department" believed Defendant knew of the scheme were told by Defendant to "go to the closet." (Tr. Feb. 11, 2008, p. 58:3-4.)

Unfortunately for Defendant, it appears that Ms. Agnew was, in fact, committing perjury during her testimony. A review of the funding forms turned over to Defendant's trial counsel, Mr. Fitzgibbons, numerous funding forms – many more than used by the government in support of its indictment and trial of Defendant. Despite the repeated statements of Ms. Agnew to the contrary, Ms. Agnew added the information regarding fake or fraudulent vehicles on at least five, and possibly as many as 17, funding forms sent to SunTrust. Moreover, the funding forms during the so-called "honeymoon period"[1] that Ms. Agnew, Ms. Burton, and Mr. Hansen claimed were missing were part of these documents produced to Mr. Fitzgibbons. None of the honeymoon period funding forms includes any fake or re-floored vehicles. The analysis of the handwriting

---

1 The "honeymoon period" was the first part of September 2004, when both Mr. Roth and Mr. Littlejohn were absent from BOBP and, purportedly, Ms. Agnew and Ms. Burton had the one and only conversation with Defendant during which Defendant is claimed to have told the ladies to "go to the closet" and prepare a fraudulent funding form to get funds from SunTrust.

on the funding forms is attached hereto as Exhibit A and incorporated herein by this reference

("Handwriting Analysis"). According to the Handwriting Analysis, the funding forms marked Q-

1 through Q-5 attached to the Handwriting Analysis have the highest degree of probability that

they were authored by Lisa Agnew, while some 12 more forms appear to have also been

authored by Lisa Agnew.

Scott Littlejohn, an indicted co-conspirator, was another key witness for the government

against Defendant. When Mr. Littlejohn testified in February 2008, he had already entered into a

plea agreement with the government, but was awaiting sentencing at the time of Defendant's

trial.  (Tr. Feb. 5, 2008, p. 31:22-23.) According to the information supplied to Defendant's

counsel from the government, child pornography was stored on the computer that Mr. Littlejohn

used at BOBP. Mr. Fitzgibbons made no investigation into the existence and extent of such child

pornography, despite the fact that attempting to avoid a criminal charge related to such

information could have motivated Mr. Littlejohn to modify his testimony in a way that was

favorable to the government's case against Defendant, but not necessarily truthful. Further, Mr.

Fitzgibbons never challenged the testimony of Mr. Littlejohn regarding when and how he learned

of the re-flooring scheme and did not contrast it to the conflicting testimony of Mr. Roth and Ms.

Agnew (Compare Tr. Feb. 6, 2008, p.132:2-17 (Littlejohn – learned from Deb Cheney); with Tr.

Feb. 6, 2008, 2d vol., p. 68:13-25 (Burton – Deb Cheney never participated in "going to the

closet"); Tr. Feb. 6, 2008, 1st vol., p. 7:25 to p. 8:3 (Agnew – no suspicion of re-flooring until

late 2003); and Tr. Feb. 7, 2008, p. 166:18 to p. 167:14 (Roth – did know when Cheney knew, if

ever, of re-flooring scheme)).

Critical accounting information regarding BOBP, which was under the direct control of

Mr. Littlejohn, was maintained on a proprietary computer systems supplied by a company known

as "Reynolds & Reynolds." Access to the extensive financial information, including the trail created by the system that would reflect who made entries into the system, who changed entries in the system, and when these things were done might well have assisted Defendant in his defense of the case. However, the system, which the BOBP receiver had allowed to be retrieved by Reynolds & Reynolds, was not investigated by Mr. Fitzgibbons, nor did he attempt to obtain a copy of the mirror-imaged computer records originally made by the government and determine if such information could be utilized in the defense of this case. This information would disclose facts that would not be disclosed by a review of the disorganized and incomplete accounting records in hard copy form found in storage. *See,* Affidavit of Lisa Blackburn, Exhibit B attached hereto and incorporated herein by this reference. Mr. Fitzgibbons also never called Ira Silver, the certified public accountant for BOBP, who could have testified about the irregularities in the accounting records maintained by Mr. Littlejohn and given to Mr. Silver. *See,* Affidavit of Defendant John C. Giovanetti, attached hereto as Exhibit C and incorporated herein by this reference.

Mr. Roth testified that there were two occasions during which Ms. Agnew would have learned of Defendant's purported knowledge of the re-flooring scheme. In addition to the September 2004 honeymoon period incident (which Ms. Agnew had testified was the **only** occasion during which she discussed the scheme directly with Defendant – *see,* Tr. Feb. 6, 2008, p. 21:18-21), Mr. Roth "recall[ed] fairly well" a time in 2003 when Ms. Agnew "was in the process of re-flooring some vehicles, and looked at me and said she was not comfortable doing that." When Mr. Roth said he, also, was not comfortable, he suggested that they both go and speak with Defendant. According to Mr. Roth, when he and Ms. Agnew went downstairs and met with Defendant, Defendant told them "that we just had to do what we had to do until we

could get down the street and move into the new dealership . . . ." (Tr. Feb. 7, 2008, pp. 128:19 to 129:14.) Mr. Fitzgibbons never discussed the discrepancy of one versus two meetings between Ms. Agnew and Defendant, or the fact that Mr. Roth's recollection of a meeting in 2003 and of Ms. Agnew being "in the process of re-flooring" also conflicted directly with Ms. Agnew's testimony that she only moved from suspicion to knowledge of the re-flooring scheme in early 2004 (*See,* Tr. Feb. 6, 2008, 1st vol., pp. 7:25 to 8:3.) *See, also,* Affidavit of Defendant, Exhibit C.

Only Defendant testified for the defense in this case. Mr. Fitzgibbons did not attempt to subpoena the testimony of Deb Cheney, Mr. Littlejohn's predecessor. According to notes of the interview of Ms. Cheney (which notes were never produced by the government to Defendant but were obtained by Defendant in March 2009 as a result of a Freedom of Information Act request), Ms. Cheney denied having ever re-floored a vehicle. This statement is contrary to statements made by government witnesses (*See, e.g.,* transcript references, p. 13, *supra*).

Finally, Defendant's counsel, Mr. Fitzgibbons, was generally unprepared to try the case for which he was retained. He confused critical dates during his closing (*See,* Tr. Feb. 11, 2008, p. 36:8-22). Despite the mass of documentary information that had to be reviewed, along with witness statements, and other reports, Mr. Fitzgibbons meet with Defendant to prepare for trial only one time – the weekend before the trial began on a Monday, too late to subpoena witnesses or properly prepare for trial. *See,* Affidavit of Defendant, Exhibit C.

### Legal Arguments

**GROUND ONE:** *Defendant was denied his Fifth Amendment due process rights when perjured testimony was introduced by the government in its case in chief and such evidence was highlight by the prosecutor in his opening statement, closing argument, and argument at sentencing.*

14

During the sentencing of Defendant, this Court stated how critical truthful testimony was to the proper functioning of our judicial system.  As the Eleventh Circuit Court of Appeals has stated,

> [a] conviction obtained by the knowing use of false or perjured testimony, including testimony that reflects on the credibility of the witness, will "be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," . . . Perjured testimony "is considered material unless failure to disclose it would by harmless beyond a reasonable doubt." [United States v. Bagley, 473 U.S. 667, 678-679, 682, 105 S.Ct. 3375, 3382-83, 87 L.Ed.2d 481 (1985)] at 680, 105 S.Ct. at 3382. . . .

*Carr v. Schofield*, 364 F.3d 1246, 1254-55 (11th Cir. 2004).

As the Handwriting Analysis shows, Ms. Agnew prepared, in whole or in part, some five to 17 funding forms. Therefore, it is clear that Ms. Agnew committed perjury when she testified that she only completed a single funding form on which the re-floored vehicles shown on the form were written by Ms. Agnew. Further, it is likely, if not conclusively, shown that Ms. Agnew also lied when she testified the one time she had written re-floored vehicles on a funding form was in September 2004.  However, all of the funding forms obtained by Defendant from the government are valid (i.e., list no fraudulent vehicles) and have no re-floored vehicles listed on them.

The prosecutor had the notes of the interviews of Ms. Agnew by government agents. (FBI, form 302, notes of April 19, 2005 interview, Exh. D attached hereto and incorporated herein by this reference).  He knew that she had not originally volunteered anything whatsoever about the critical meeting with Defendant during the honeymoon period.  He knew also had the notes of the agents' interview of Ms. Burton. As was the case with Ms. Agnew, Ms. Burton also failed to volunteer to those agents the meeting with Defendant during which Defendant purportedly directed Ms. Agnew and Ms. Burton to "go to the closet." Further, a review of these

notes would reflect that Ms. Agnew stated that she and Tammy Burton both were instructed to "go to the closet," although she stated that she only went when Littlejohn was absent from BOBP. (Exh. D, p. 4.) The government had the funding forms and could easily have compared those forms to the stories that were finally settled upon by Ms. Agnew and Ms. Burton.

In the criminal case against Defendant, no direct evidence was presented during the trial relating to Defendant's participation in the conspiracy and re-flooring scheme. Mr. Hansen, in his closing arguments, referred to the "buffer" created between Defendant and the other co-conspirators. Under those circumstances (the changing stories of Ms. Agnew and Ms. Burton, the multiple fraudulent funding forms completed by Ms. Agnew, and the unexplained inability to produce the "one" funding form admitted to by Ms. Agnew from the honeymoon period), one must believe that the government either knew of Ms. Agnew's perjury or should have known of it. In either event, Defendant's right to due process was denied to him by the use of the perjured testimony of Ms. Agnew.

In his Section 2255 Motion Defendant has asked this Court to hold and evidentiary hearing and to allow Defendant to engage in discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings. Allowing Defendant to engage in discovery in preparation for an evidentiary hearing on Defendant's Section 2255 Motion may well allow Defendant to uncover further evidence of perjury by Ms. Agnew and the other key government witnesses. For example, information may be obtained from Reynolds & Reynolds that will disclose the full scope of activities by Mr. Littlejohn, including the cover-up of other illegal activity suspected by Ms. Blackburn in her affidavit (Exhibit B), which would be consistent with the testimony of the receiver, Mr. Rosenfield. Mr. Littlejohn's perjury may also be disclosed by further investigation of the child pornography that was noted to have been on Mr. Littlejohn's BOBP computer.

The Handwriting Analysis, along with the conclusion that must be drawn therefrom that Ms. Agnew committed perjury, as well as other evidence that Defendant may now be able to develop, is respectfully submitted to this Court in the hope that it will allow the Court an opportunity to make good on its commitment made during the sentencing proceedings on May 12, 2008: "If it turns out somehow, someway that Edward Littlejohn and Mr. Roth and Tammy Burton and Lisa Agnew all lied under oath and you have been wrongly convicted, I would not hesitate to enter an appropriate order."

**GROUND TWO**: *Defendant was denied effective assistance of counsel by his trial counsel when Defendant's counsel failed*

    *(a)*    *to uncover the perjured testimony of Ms. Agnew;*

    *(b)*    *to show the motive for Mr. Littlejohn to commit perjury to prevent an investigation by the government into the child pornography on Mr. Littlejohn's computer;*

    *(c)*    *to obtain the accounting information from Reynolds & Reynolds that would have disclose the fraudulent or inappropriate activities of Mr. Roth or Mr. Littlejohn;*

    *(d)*    *to put on any testimony, other than defendant (such as Deb Cheney, Ira Silver, CPA, Bernard Morse, Tim Winningham, or James Meyer ), to refute the testimony of the government's witnesses;*

    *(e)*    *failed to develop testimony or argument that a SunTrust official had suggested the back-dating and/or the re-flooring scheme(s);*

    *(f)*    *failed to cross the receiver to elicit testimony that no significant transfer of funds from BOBP to defendant were uncovered by the receiver, who would have had the power to seek recovery of such transfers;*

    *(g)*    *failed to challenge the credibility of the government's witnesses, especially when their stories of meetings with defendant and his use of the phrase "go to the closet;" and*

    *(h)*    *failed to properly prepare for trial or conduct a pre-trial investigation.*

Defense counsel's function in a criminal case is to assist the defendant, and part and parcel of this function is the duty to advocate the defendant's cause. *Strickland, supra,* 466 U.S. at 658, 104 S.Ct. at 2066. The right to the effective assistance of counsel is the right of the accused to force the prosecution's case to survive the crucible of a meaningful adversarial testing. *Id.,* 466 U.S., at 687, 104 S.Ct. at 2064. Failure to present such damning and powerful evidence

as the additional funding forms on which re-floored vehicles were written by Ms. Agnew prevented Defendant from getting a fair trial. The jury did not have important evidence it needed to properly assess the credibility of Defendant and Ms. Agnew. Defendant, since his incarceration, has had the time and opportunity to review the information supplied to his trial counsel by the government prior to his February 2008 trial. This review is a critical task that should have been done by Mr. Fitzgibbons has part of the trial preparation undertaken in order to fulfill the mandate that Defendant be provided with adequate representation during the government's prosecution of Defendant.

Significantly, Mr. Fitzgibbons appears to have constructed the entire defense on the idea that simply pointing out that the four former BOBP defendants would benefit from assisting the government in its case against Defendant. Unfortunately, the jury could also conclude, which it apparently did, that Defendant had a similar or greater incentive to lie to avoid the consequences of a guilty verdict. Therefore, direct proof that one or more of the government's witnesses were committing perjury would, without any doubt, been material to the defense and bolstered Defendant's claim of innocence.

As this Court may recall from the hearing of May 12, 2008, on Defendant's motion for a new trial, it was known to Mr. Fitzgibbons that child pornography was found on the BOBP computer used by Mr. Littlejohn. Rather than thoroughly investigation this information, it appears that Mr. Fitzgibbons never attempted to obtain copies of the hard drives of the BOBP computers (including Mr. Littlejohn's computer) to determined whether such pornography actually was on the computer. Clearly, had such pornography been found on Mr. Littlejohn's computer, it would have brought into serious doubt his creditability as a witness against Defendant – a witness attempted to be as cooperative as possible in order to minimize his

potential criminal exposure and, hopefully, prevent a criminal investigation into the pornography. Mr. Fitzgibbons' failure to undertake the investigation of the pornography on Mr. Littlejohn's BOBP computer "fell short of . . . professional standards" and prejudiced Defendant. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 2536 (2003) and *Porter v. McCollum,* 558 U.S. ___, 130 S.Ct. 447 (2009).

Mr. Fitzgibbons' failure to actively prepare for his representation of Defendant is also seen in his failure to attempt to retrieve any financial data of BOBP that had been created on the Reynolds & Reynolds computer system. Under the Reynolds & Reynolds system, most of the data was, apparently, stored on the servers of Reynolds & Reynolds.  It appears that the government chose to not seek information from Reynolds & Reynolds. Defendant attempted to explain the Reynolds & Reynolds system to his trial counsel and explain the importance of retrieving the relevant financial information. Defendant told Mr. Fitzgibbons that such data would likely disclose financial irregularities generated by Mr. Littlejohn and, perhaps, Mr. Roth. (*See,* Affidavit of Defendant, Exh. C and Affidavit of Blackburn, Exh. B.)  Such irregularities could well show that those two individuals had an incentive to lie, beyond simply trying to appear to be cooperative with the government in order to obtain a lighter sentence (as suggested by Mr. Fitzgibbons), but might also have been lying in order to prevent the government from discovering the truth about the criminal conspiracy that occurred at BOBP, with the result being significant criminal exposure for both Mr. Roth and Mr. Littlejohn. Therefore, it was imperative that Mr. Fitzgibbons attempt to obtain the only financial information that would clearly disclose such irregularities.  Mr. Fitzgibbons never undertook any such investigation. Mr. Fitzgibbons did not even have Mr. Rosenfield's testimony highlighted when Mr. Rosenfield, the receiver,

testified on cross examination as to the horrid state of the accounting records at BOBP

maintained by Mr. Littlejohn.

> Q:    So as part of your fee and your duties, you examined the
> books and the records and the journals and the ledgers, financial
> statements and tax returns; did you not?
> . . .
> A:    We had to do bank reconciliations that were never done
> before. We had to go find out how much out of whack they were at
> the banks. I mean, it was – it was like coming into a big trash pole
> and turning it into something that we could sell.
> . . .
> Q:    The journal entry, is that done through a computer or by
> hand or both?
> A:    Well, you'd keypunch the journal entries into the
> accounting system. They were basically circumventing what the
> system would do.
> . . .
> Q:    . . . A human being has to do this, and who did it?
> A:    Well, their – the only person that was doing those, if I
> recall, was the controller.
> Q:    Who was that?
> A:    Scott Littlejohn would have been making – most of those
> entries were made by Scott Littlejohn.

(Tr. Feb. 5, 2008, p. 169:18 to p. 175:10.)

Mr. Fitzgibbons' failure to undertake the investigation of the Reynolds & Reynolds data and

delve into the facts that the disorganized state of the BOBP accounting records could cover-up

wrongdoing by persons other than Defendant "fell short of . . . professional standards" and

prejudiced Defendant. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 2536 (2003) and

*Porter v. McCollum*, 558 U.S. ____, 130 S.Ct. 447 (2009).

Defendant also requested that Mr. Fitzgibbons call several individuals to testify for the

defense (see, Affidavit of Defendant, Exh. C) – including:

(a)  Deb Cheney who gave a statement to the government agents in which Ms. Cheney

denied having any part in, or even knowledge of, the re-flooring scheme, contrary to the

20

representations of other government witnesses, such as Ms. Agnew, Mr. Roth, and Mr. Littlejohn (*See,* FDLE Investigative Report, Jan. 19, 2006, by Agent Miles, Exhibit E, attached hereto and incorporated herein by this reference);

(b)  Ira Silver, CPA, who would have testified of the irregular records, improper activities, and delaying tactics of Mr. Littlejohn with respect to BOBP accounting records;

(c)  Bernard Morse, BOBP's bankruptcy attorney who would have testified that few assets were transferred from BOBP to Defendant and that Defendant made significant capital infusions into BOBP;

(d)  Tim Winningham, BOBP's General Sales Manager, who would have testified, contrary to the government's former BOBP employee witnesses, that Defendant was "hands off" of most aspects of the operations of BOBP (other than sales) and the Mr. Roth was the final authority for most of the other aspects of the operation of BOBP; and

(e)  James Meyer, BOBP's corporate attorney, who would have testified that Mr. Roth had informed Mr. Meyer that Craig Hutchinson of SunTrust had instructed Mr. Roth on how to re-floor cars in order to cover cash flow shortfalls and keep SunTrust as its lender.

Rather than touching on trial tactics, the failure to call these witnesses for the defense was another example of Mr. Fitzgibbons' deficient conduct that establishes "a probability sufficient to undermine confidence in the outcome" of Defendant's trial.  *Strickland,* 466 U.S. 693-94, at 104 S.Ct. at 2068.

At a minimum, such information regarding the veracity of Ms. Agnew's and Mr. Littlejohn's testimony might well have dissuaded this Court from enhancing Defendant's sentence for obstructing justice by giving false testimony.

Mr. Fitzgibbons' constitutional shortcomings are also seen in his failure to press the

BOBP receiver on the lack of unwarranted or unusual funds transfers from BOBP to Defendant, and his failure to highlight the inconsistencies in the testimony of the former BOBP employees as to the supposed meetings with Defendant during which the phrase "go to the closet" – the purported code words for the re-flooring scheme – was uttered by Defendant. Compare the following testimony of key government witnesses:

Tammy Burton, questioned about the phrase "go to the closet:"

> Q:    And who used it so often that you overheard.
> A.    Scott, Kelly.
> Q:    Anybody else:
> A:    Not that I can think of.
> Q:    What about Mr. Giovanetti:
> A:    If he said it, it wasn't in my presence.
> Q:    What about the time in September?
> A:    That would be the only time that I can think of that he said it.

(Tr. Feb. 6, 2008, 2d vol. p. 62:11-19)

Scott Littlejohn, questioned about the phrase "go to the closet:"

> Q:    Was that term ever used in conversations with John Giovanetti?
> A:    Not in those exact terms, no.
> Q:    And when you say that, what do you mean?
> A:    He's never said, "go to the closet," or "going to the closet."
> That's never been the issue.  I mean, that's never been a topic that came out of his mouth.
> Q:    You've never heard that from him?
> A:    No.

(Tr. Feb. 6, 2008, 2d vol., p. 142:15-24.)

Kelly Roth, questioned about discussions of re-flooring automobiles:

> Q:    What would be the tenor of the discussions?
> A:    The tenor of the discussions is that – well, I know of two or
> – two circumstances that I can recall fairly well. One of them I was at – Lisa Agnew's office is where the fax machine was, and I went down to fax a document and she –
> Q:    What time period would this have been?
> A:    I want to say probably in '03.

Q:      Go ahead.

A:      And she was in the process of re-flooring some vehicles, and looked at me and said she was not comfortable doing that. And I said, well, I'm not comfortable, either. She said, does John know what's going on? I said, yes, he does. She said, well, I want to talk to him. I said, well, let's go.

So we went down and she shared with John her concerns that she was uncomfortable flooring vehicles. And he told her that we just had to do what we had to do until we could get down the street and move into the new dealership . . . .

Q:      And are you – is there any question in your mind based upon the discussion that took place between her and Mr. Giovanetti that you overheard that he understood what she was talking about?

A:      No question at all. The other incident was Mr. Littlejohn and myself were both going to be on vacation at the same period of time. And John had myself and Scott in his office, and asked Scott was – I believe it was Lisa – he asked was Lisa comfortable with re-flooring titles as well as changing dates on billing invoices while Scott was gone.

(Tr. Feb. 7, 2008, p. 128:18 to p. 130:9.)

Lisa Agnew, questioned about precisely what information she had that Defendant participated in

the re-flooring scheme:

A:      That the week that Mr. Roth and Mr. Littlejohn were both out of the office and we needed money in the bank, Tammy and I – Tammy Burton went to Mr. Giovanetti to see if he had a means of money, a check from one of the other people that we got checks from occasionally, swapped checks, and that was not available, and he mentioned going to the closet.

Q:      So that is the very first time that you knew precisely that Mr. Giovanetti, according to you, was in on the floor planning scheme; is that correct?

A:      That's when I knew that he knew for sure.

Q:      This was the time that, as I understand your direct testimony, that Mr. Roth was on vacation, Mr. Littlejohn was getting married, so obviously he was gone, and so, that is why you and Tammy Burton went to Mr. Littlejohn and had this conversation; is that correct?

A:      We went to Mr. Giovanetti.

Q:      I'm sorry, Mr. Giovanetti, and had this conversation, correct?

A:      Yes, we did.

23

Q:   So, that took place in what time?
A:   September.
Q:   Of '04?
A:   Of '04.
Q:   So, all of this time now that you are there, this is the very
first time that you have precise, direct his-voice-to-your ear
knowledge of Mr. Giovanetti's involvement, correct?
A:   Direct comment to me.  The closet had been mentioned, in
fact previous times. Was it referring to that, I can't say, but it was
mentioned.
Q:   Okay. Now, in addition to this one conversation in
September of '04, again, his-voice-to-your-ear direct knowledge,
what other instances do you have?
A:   None from him.

(Tr. Feb. 6, 2008, 1st vol., p. 20:12 to p. 21:21.)

Finally, considering the stakes, it is almost ineffective assistance of counsel *per se* for

Mr. Fitzgibbons to simply set aside one weekend, immediately prior to the trial, to work with

Defendant in preparing for the trial. Although Mr. Fitzgibbons may be an experienced attorney,

certified by The Florida Bar as a criminal trial attorney, who is, therefore, entitled to the

presumption that his performance was reasonable and that he "made all significant decisions in

the exercise of reasonable professional judgment," *Strickland,* 104 S.Ct. at 2065-66; *accord*

*Williams v. Head,* 185 F.3d 1223, 1227-28 (11th Cir.1999), this presumption can be overcome

and is overcome in this case based on the facts set forth above. Therefore, Mr. Fitzgibbons'

multiple failures to proper act on behalf of Defendant "fell short of . . . professional standards"

and prejudiced Defendant. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 2536 (2003)

and *Porter v. McCollum*, 558 U.S. ____, 130 S.Ct. 447 (2009).  Further, Mr. Fitzgibbons's

conduct as counsel to Defendant was so deficient as to have undermined the trial process,

thereby failing to produce a just result. *Strickland,* 466 U.S., at 694, 104 S.Ct. at 2052.

**Hearing and Discovery**

Defendant, in his Section 2255 Motion and this Memorandum in Support, makes specific

allegations as to the reasons why his claims that he is entitled to having his conviction and sentence set aside and be afforded a new trial.  These allegations are far beyond pure speculation.  Therefore, Defendant has done what is required of him to obtain discovery and a hearing on his Section 2255 motion. *See Bracy v. Gramley*, 520 U.S. 899, 908-09, 117 S.Ct. 1793 (1997) (a movant must provide specific allegations lending support to his claims); *see also McDaniel v. United States District Court ("Jones")*, 127 F.3d 886, 888 (9th Cir.1997) (good cause for discovery found where petitioner's claims did not appear purely speculative, each claim included factual allegations, and materials sought through discovery were not available from petitioner's appellate counsel); *Jones v. Wood,* 114 F.3d 1002, 109-10 (9th Cir. 1997) (good cause found where petitioner identified specific material he needed to argue effectively that trial lawyer had rendered ineffective assistance).

## Conclusion

Defendant's conviction and sentence must be set aside, and Defendant must be tried anew.

DEFENDANT RESPECTFULLY REQUESTS A HEARING ON HIS SECTION 2255 MOTION.

Respectfully submitted this 29th day of December, 2009.

/s/ Harrison T. Slaughter, Jr.
Florida Bar No. 194822
Leventhal & Slaughter, LLP
111 N. Orange Avenue, Suite 700
Orlando, Florida   32801
Telephone No. (407) 849-6161
Fax No. (407) 843-3738
E-mail:  butch@leventhal-slaughter.com

December 21, 2009

Harrison T. Slaughter, Jr
Law Offices of Harrison t. Slaughter, Jr.
111 North Orange Avenue, Suite 700
Orlando, Florida  32801

Re:   Questioned Document Examination
       Lisa Agnew

**Synopsis:**     The Law Offices of Harrison T. Slaughter, Jr. met with this Document
Examiner at his office.  Submitted for forensic examination were nineteen (19)
documents titled SunTrust Bank New/Used Vehicle Funding Request.  An affidavit by
Mary Giovanetti indicated that the writing to be examined was written by Lisa Agnew.
Submitted as a known, or standard, was SunTrust Bank New/Used Vehicle Funding
Request bearing a date of 10/29/2003. We marked this item as K-1 and enlarged it by
computer 400% for more accurate evaluation.

Standard procedures were followed to include review of appearance strokes, regularities,
irregularities, similarities and differences, height and weight of strokes, pen lifts,
proportionate height, fluidity, degree of slant, space allocations, starting and finishing
strokes and tics, t-bars, etc.

**Conclusion:**    With regard to the writings on Q-1 through Q-5 those documents to the
highest degree of probability were authored by the same individual that has been
identified as Lisa Agnew.  Documents Q-9 and Q-15 I have been unable to make a
determination.  As for documents Q-6, Q-7, Q-8, Q-10, Q-11, Q-12, Q-13, Q-14, Q-16,
Q-17, Q-18 and Q-19, while a full examination was not done on these documents, it
appears to have been authored by the same individual as Q-1 through Q-5 who has been
identified by affidavit as that of Lisa Agnew.

I have enclosed an enlargement as comparison for your review.

If you have any questions with respect to the foregoing, please don't hesitate to call.

Sincerely,

Harvey C Altes
Court Certified Questioned Document Examiner
Diplomate of American College of
Forensic Examiners

EXHIBIT A

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**
      **Plaintiff,**

CASE NO.    8:07-CR-295-127-MAP

v.

**JOHN C. GIOVANETTI,**
      **Defendant.**

_____/

### AFFIDAVIT OF HARVEY C. ALTES

BEFORE ME, the undersigned authority, personally appeared **HARVEY C. ALTES** who after being first duly sworn, depose and says:

1.    I am over the age of eighteen years, competent and authorized to make this affidavit.

2.    This affidavit it based on personal knowledge.

3.    I am a Certified Questioned Document Examiner and member of the America College of Forensic Examiners.

4.    I have been involved in graphoanalysis since 1952. I have been qualified as an expert and have rendered expert opinions in the Circuit Courts of the Seventh Judicial Circuit in the field of graphoanalyis on approximately twenty occasions and submitted hundreds of written opinions in court related matters. I have provided graphoanalysis services to the State Attonrey's Office, Minnesota Title Company, the Office of the Public Defender for the Seventh Judicial Circuit, and the Florida Bar Association.

5.    I have recently been contacted by Harrison T. Slaughter, jr of the Law Offices of Harrison T. Slaughter, jr. for the purpose of providing graphoanalysis in the matter of verification of certain writings of what have been identified by the affidavit of Mary Giovanetti as the writings of

Lisa Agnew (K-1).

6.     Mr. Slaughter provided my office with a copy of what had been identified as the writing of Lisa Agnew (K-1) for analysis of other writings on documents which have been identified as Q-1 through Q-19.

7.     I analyzed the above-referenced documents in my offices in Daytona Beach, Florida on December 21, 2009. It is my opinion that the writings on the documents Q-1 through Q-5 were authored by the same individual who has been identified as Lisa Agnew by Affidavit of Mary Giovanetti. More specifically, there are significant variations in degrees of slants, formulation of letters, space allocation, proportions of height, and many other various factors utilized in graphoanalysis, that conclusively support my finding. On Q-9 and Q-15 I have been unable to with the highest degree of probability determined that they were written by who has been identified as Lisa Agnew.  Additionally, documents Q-6, Q-7, Q-8, Q-10, Q-11, Q-12, Q-13, Q-14, Q-16, Q-17, Q-18 and Q-19, a full examination was not performed, but appears were authored by the same person who has been identified as Lisa Agnew.

**FURTHER AFFIANT SAYETH NOT.**

Harvey C. Altes
Harvey C. Altes

The foregoing instrument was acknowledged before me this 23 day of December, 2009, by Harvey C. Altes who is <u>personally known to me</u> or has produced _____ as identification and who did take an oath.



Notary Public:
Sign: Susan E. Young
Print: SUSAN E. YOUNG
Commission No. DD0650656
My Commission expires: 5/22/2011

SUSAN E. YOUNG
Comm# DD0650656
Expires 5/22/2011
Florida Notary Assn., Inc

## Harvey C. Altes
FALCON INTERNATIONAL BUILDING
728 FENTRESS BOULEVARD
DAYTONA BEACH, FLORIDA 32114
1-800-874-7428 . 386-274-1000. Fax 386-274-3314

## QUESTIONED DOCUMENT EXAMINER

**Qualifications:**

Diplomate – American College of Forensic Examiners
Certified American Board of Forensic Handwriting Analysts
Former Chief Investigator – Office of State Attorney
 7th Judicial Circuit of Florida
Former Member – Florida Association for Identification
 (Questioned Document Examiner)
Former Examiner – Chicago Title Co.
Former Examiner – Minnesota Title Co.
Member – National Association of Certified Fraud Examiners
Court Qualified – 7th Judicial Court of Florida (since 1964)
Court Appointed Examiner for Office of Public Defender
 7th Judicial Court of Florida
Former Investigator for Florida Senate-Select Committee
Former Special Investigator for Attorney General
Former Consultant for State Attorney, Daytona Beach Police
 Department, SunTrust
Private Investigator – State License #42A (since 1952)
Former Examiner – Florida Bar Association – Orlando, Florida

**Systems Employed:**

ISQD  - Billie Bates – Identification System for Questioned Documents
Forgery Crosscheck System
Document Examiner – Jess Dines
Cross Check Systems – Williamson

**References:**

Scientific Examination Questioned Documents Ordway Hilton
Handwriting Identification: Facts & Fundamentals - Hubert Headrick
Questioned Documents – Osborn
Forgery – Sternitsky
Evidential Documents – Conway
Questioned Documents – Caputo

*Diplomate – American College of Forensic Examiners*
*Certified – American Board of Forensic Examiners*






*The American College of Forensic Examiners*

*Your achievement of receiving Diplomate status, three years of continuous service to our society, your professional record and achievements has lead to this honor being bestowed to you.*

*Harvey C. Altes*

## Fellow of the College

*David Ely Rosengard*

David Rosengard, M.D., Ph.D.
Chairman, Executive Advisory Boards

Robert L. O'Block, Ph.D.
Executive Director

Identification Number

2

*March 1997*

This certificate is the property of the American College of Forensic Examiners and in the event of its suspension, revocation or invalidation for any reason, it must on demand be returned to the American College of Forensic Examiners.



# American College of Forensic Examiners

hereby recognizes the high level of professional scientific
involvement as well as the contribution to the field of forensic
examination and bestows upon

## Harvey Altes

the title of Member of the
American College of Forensic Examiners
with all the rights and privileges pertaining thereto, as long as
annual membership requirements are met and the
Code of Ethics are upheld.

Robert L. O'Block, Ph.D.
Executive Director

Vincent Scalice
Chairman of the Board

02

Membership Identification Number

4/3/96

Date



This certificate is the property of The American College of Forensic Examiners and in the event of its suspension, revocation or invalidation for any reason it must on demand be returned to the American College of Forensic Examiners.

SunTrust Bank, Central Florida
New / Used Vehicle Funding Request

Big Oaks Buick
Obligor # 0050195914
DDA Account #  0056000309001

Plan# 18/26/42/59

Date:  10-24-03
Bank #:  12 - Central Florida

LISA Agnew

OCT 30 2003

Please add the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 01 | Buick | Century | New | 2G4WY55J511164603 | 43155A | $8,575.00 |
| 2 | 00 | GranPrix | GranPrix | New | 1G4nW52E4YM710892 | 6734 | 8,750.00 |
| 3 | 00 | merz | mL320 | Used | 4JGAB54E2YA155149 | K6-798 | 24,100.00 |
| 4 | 98 | Isuzu | Rodeo | Used | 4S2CK58W3W4336843 | K6-794 | 6,350.00 |
| 5 | 00 | Merz | E320 | Used | WDBJF65J1YB058688 | K6753 | 26,950.00 |
| 6 | 04 | Nissan | maxima | Used | 1N4BA41E35C262378 | K6160 | 21,200.00 |
| 7 | 02 | Cadi | Escalade | Used | 1GYEC63T02R124443 | 37600 | 37,600.00 |
| 8 | 04 | Toyota | RAV4 | Used | JT3HP10V34C070150 | K6757 | 7,650.00 |
| 9 | 98 | Ford | Explorer | Used | 1FMZU17L0WLA54186 | K6755 | 11,535.00 |
| 10 | 00 | Volvo | V70 | Used | YV1SZ58D4Y1029607 | K6758 | 26,800.00 |
| 11 | 03 | GMC | Sierra 1500 | Used | 1GTEC11X5ZZ153298 | 64035A | 24,300.00 |
| 12 | 01 | Cadi | DeVille | Used | 1G6KD54Y01U231174 | K6793 | 21,900.00 |
| 13 | 00 | Isuzu | Rodeo | Used | 4S2CK58W0Y4305511 | K6755 | 11,075.00 |
| 14 | 00 | Ford | E320 | Used | WDBJF65J6YA164414 | K6792 | 28,650.00 |
| 15 | 99 | | Camero | Used | 2G1FP22K0X2137912 | K678e | 11,035.00 |
| 16 | 99 | Chev | Suburban | Used | 3GNEC16R0XG207587 | K6777 | 20,035.00 |
| 17 | 03 | Chev | Monte Carlo | Used | 2G1WX12K139646203 | K6683 | 17,975.00 |
| 18 | | | | | | | |
| 19 | | | | | | | |
| 20 | | | | | | | |
| | | | | | | Total Funded | 309,235.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0174 prior to 2:00PM for same day funding.  For each new vehicle please fax a copy of the front of the MSO.  For each used vehicle please fax a copy of the front of the title.

| 9 | 93 | Ford | Expedition | used | 1Fr |
| 3 | 03 | Ford | F150 | 4 | 1FTRW08L49K |
| | 1EmdulTowdAs4la | Kle755 | 11535.00 | | K1 Q1 |
| | 4akD03562 | Kl68G3 | 22528.00 | | |

# SunTrust

*Funding Form*

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Date: 5-3-04

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 01 | Lexus | LS430 | U | JTH8N30F910003804 | K6796 | 38,150.00 |
| 2 | 01 | Ford | Taurus | U | 1FAFP53U51A159935 | 221910 | 14,450.00 |
| 3 | 02 | Ford | F150 | U | 1FTRW08L44KD05562 | K6803 | 22,528.00 |
| 4 | 01 | Ford | Expedition | U | 1FMRU17X1XLA80537 | K6820 | 20,250.00 |
| 5 | 01 | Chevy | Tahoe | U | 1GNEC13T81J270170 | K6813 | 17,050.00 |
| 6 | 01 | Toyota | Camry | U | JTEHT05V616020035 | K6912 | 31,000.00 |
| 7 | 02 | Lexus | ES300 | U | JTHBF30G520034815 | K6886 | 25,200.00 |
| 8 | 02 | Nissan | Altima | U | 1N4AL11D22C107568 | 23087A | 14,150.00 |
| 9 | 01 | Ford | Expedition | U | 1FMRU17L21LA93711 | 6315A | 20,250.00 |
| 10 | 01 | GMC | Yukon XL | U | 3GKEC13G31G134446 | 6331A | 21375.00 |
| 11 | 01 | Ford | E250 | U | 1FTNW21F51EB11526 | 6337A | 23375.00 |
| 12 | 02 | Ford | F350 | U | 1FTSW31F02EC02601 | 64070A | 23800.00 |
| | | | | | | **Total Funded** | $ 267,178.00 |

Please e-mail this form to  NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.  For each new vehicle please fax a copy of the front of the MSO.  For each used vehicle please fax a copy of the title.

# SunTrust

**Payoff Form**

**Client: Big Oaks Buick Pontiac GMC**
**Customer # 005019591 4 /Plan # 18, 26, 42, 59**
**DDA Account # 005600309001**

Date: APR 27 2004   4/27/04

Please payoff the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | Last six of Vin Number | Stock Number (optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 03 | Gmc | Yukon | new | 135123 | 63157 | 39,608.24 |
| 2 | 04 | Gmc | 2500 | new | 118606 | 64110 | 45,866.33 |
| 3 | 04 | Gmc | 1500 | new | 278627 | 64165 | 30089.31 |
| 4 | ~~~~ | ~~~~ | ~~~~ | ~~used~~ | ~~~~ | ~~64141~~ | ~~25503.56~~ |
| 5 | 04 | Gmc | 1500 | new | 298913 | 64141 | 25503.56 |
| 6 | 04 | Gmc | 1500 | new | 285123 | 64198 | 25,330.75 |
| 7 | 04 | Gmc | 1500 | new | 270137 | 64125 | 25336.75 |
| 8 | 03 | Gmc | Van | used | 100505 | 67140 | 17800.00 |
| 9 | 03 | Buick | LeSabre | used | 288316 | 64023CD | 16025CD |
| 10 | 04 | Buick | LeSabre | new | 331537 | 44053A | 24508.78 |
| 11 | 04 | Gmc | Envoy | new | 157489 | 64004 | 27057.68 |
| 12 | 04 | Gmc | Envoy | new | 470572 | 64172 | 23,600.31 |
| | | | | | | **Total Paid** | 326,630.55 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.

# SUNTRUST

**Funding Form**

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 005600309001**

**Date:** 4-30-04

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | merz | ML320 | U | 4JGAB54E2YA155149 | Kle728. | 21300.00 |
| 2 | 01 | Lexus | ES300 | U | JT8BF28G510330737 | Kle910. | 18300.00 |
| 3 | | | | | | | |
| 4 | 00 | Honda | Accord | U | 1HGCG22S5YA003640 | Kle598 | 13,000.00 |
| 5 | 02 | Ford | F150 | U | 1FTRW07L052K857479 | Kle601 | 16475.00 |
| 6 | 00 | Ford | F150 | U | 1FT2X07A9YKA340710 | Kle613 | 11750.00 |
| 7 | 01 | Ford | F150 | U | 1FTNW21F31ED38776 | le637 | 23375.00 |
| 8 | | | | | | | |
| 9 | 02 | Chev | Corvette | U | 1G1YY32G825114327 | Kle682. | 31800.00 |
| 10 | 01 | merz | E430 | U | WDBJF70J11B234608 | Kle739. | 30950.00 |
| 11 | 03 | Ford | F150 | U | 2FTRX07353CA44630 | Kle739. | 16950.00 |
| 12 | 03 | Cad | Escalade | U | 1GYEK63N13R308635 | Kle754 | 40635.00 |
| | | | | | **Total Funded** | | **$ 218,335.00** |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

Funding Form

Date: 5-3-04

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 005019591 4 / Plan # 18,26,42,59**
**DDA Account # 005600030900 1**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 04 | ~~(illegible)~~ | ~~(illegible)~~ | U | ~~STH60~~ 304H003804 | K6744 | 38,500.00 |
| 2 | 04 | Ford | Taurus | 4 | 1FAFP53U51A119925 | 221914 | 1450.00 |
| 3 | 04 | Ford | F150 | 4 | 1FTRW08L44KD05562 | K6803 | 23528.00 |
| 4 | 04 | Ford | Expedition | U | 1FMRU17L4LA80537 | K6820 | 30250.00 |
| 5 | 04 | Chevy | Tahoe LongCruiser | 4 | 1GNEC13T815270170 | K6813 | 17050.00 |
| 6 | 04 | Toyota | LandCruiser | 4 | JTEHT05J842000235 | K6712 | 33,000.00 |
| 7 | 04 | Lexus | ES300 | 4 | JTHBF30G520034815 | K6846 | 25300.00 |
| 8 | 04 | Nissan | Altima | 4 | 1N4AL11D22C107543 | 23087A | 14150.00 |
| 9 | 04 | Ford | Expedition | U | 1FMRU17L4X?49671 | 23156A | 20250.00 |
| 10 | 04 | GMC | Yukon XL | 4 | 3GKEC13T31G194446 | 63316A | 21375.00 |
| 11 | 04 | Ford | F250 | 4 | 1FTNW21L51EB115246 | 23207A | 23375.00 |
| 12 | 04 | Ford | F350 | 4 | 1FTSW31F03EC02601 | 64070A | 23800.00 |
| | | | | | | Total Funded $ | 267178.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

**Funding Form**

**Client: Big Oaks Buick / Pontiac / GMC Truck**

**Customer # 0050195914 / Plan # 18,26,42,59**

**DDA Account # 005600309001**

**Date:** 5-12-04

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | Chev | 1500 | U | 2GCEC19V11041470 | K6804 | 13075.00 |
| 2 | 03 | Ford | F150 | U | 1FTRW07333KC59113 | 6805A | 23000 |
| 3 | 04 | | | | | K6851 | 27200 |
| 4 | 03 | Ford | F250 | U | 1FTNX21F23EA54820 | K6857 | 26750.00 |
| 5 | 02 | Cad | Escalade | U | 1GYEC63T22R121607 | K6864 | 34500.00 |
| 6 | 00 | Jaguar | S Type | U | SAJDA01C4YFL25126 | K6893 | 18250.00 |
| 7 | 00 | Toy | Camry | U | 4T1BG22K6YU672607 | K6851 | 7495.00 |
| 8 | 02 | Ford | F150 | U | 1FTRX17X72KA54518 | K6808 | 16650.00 |
| 9 | 00 | Lexus | RX300 | U | JT6GF10U0Y0073712 | K6806 | 21700 |
| 10 | 01 | Volvo | S60 | U | YV1RS53N612005832 | K6811 | 19500 |
| 11 | 01 | GMC | Sierra | U | 2GTEC19U811267714 | K6844 | 16075.00 |
| 12 | 01 | Ford | F150 | U | 1FTRW08L01EB46356 | K6916 | 18550.00 |

| | Total Funded | $ 245,575.00 |
|---|---|---|

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

Funding Form

Date: 5-12-04

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 005600030900**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | Chev | 1500 | U | 2GCEC19V911041170 | K6804 | 13075.00 |
| 2 | 03 | Ford | F150 | U | 1FTRW07333KC59113 | 6805A | 23000 |
| 3 | 02 | Lexus | RX300 | U | JT6GF10U020143445 | K6851 | 27300 |
| 4 | 03 | ~~Ford~~ | | U | | K6857 | 26750.00 |
| 5 | 02 | Cad | Escalade | U | 1GYEC63T22R121607 | K6864 | 34500.00 |
| 6 | 00 | Jaguar | S-Type | U | SAJDA01CXYFC251326 | K6893 | 18250 |
| 7 | 00 | Toy | Camry | U | 4T1BG22K61U672607 | K6857 | 9425 |
| 8 | 02 | Ford | F150 | U | 1FTRX17L72KA54518 | K6808 | 18650 |
| 9 | 00 | Lexus | RX300 | U | JT6GF10U600073372 | K6806 | 21700 |
| 10 | 01 | Volvo | S80 | U | YV1TS53N611005832 | K6811 | 19500 |
| 11 | 01 | GMC | Sierra | U | 2GTEC19V8112697774 | K6944 | 16075 |
| 12 | 01 | Ford | F150 | U | 1FTRW31S01EB45156 | K6716 | 18850.00 |
| | | | | | | Total Funded | $ 245,575.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

Date: 5-3-04

Funding Form

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 01 | Lexus | LS430 | U | JTHBN30F910003804 | K6796 | $ 38150.00 |
| 2 | 01 | Ford | Taurus | U | 1FAFP53U51A199... | 231917 | 7450.00 |
| 3 | 02 | Ford | F150 | U | 1FTRW08L04KD05562 | K6803 | 22528.00 |
| 4 | 01 | Ford | Expedition | U | 1FMRU17LX1LA80537 | K6810 | 20250.00 |
| 5 | 01 | Chevy | Tahoe | U | 1GNEC13T81J270170 | K6812 | 17050.00 |
| 6 | 01 | Toyota | Land Cruiser | U | JTEHT05V610000935 | K6842 | 33000.00 |
| 7 | 02 | Lexus | ES300 | U | JTHBF30G520034815 | K6846 | 25200.00 |
| 8 | 02 | Nissan | Altima | U | 1N4AL11D22C107582 | 23087A | 14150.00 |
| 9 | 01 | Ford | Expedition | U | 1FMRU17L21Y049571 | 21375A | 20250.00 |
| 10 | 01 | GMC | Yukon XL | U | 3GKEC16T316344446 | 6231617 | 21375.00 |
| 11 | 01 | Ford | F250 | U | 1FTNW21F51EB11526 | 6237A | 23375.00 |
| 12 | 02 | Ford | F350 | U | 1FTSW51F02EC02601 | 64070A | 23800.00 |
| | | | | | | **Total Funded** | $ 267178.00 |

Please e-mail this form to  NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.  For each new vehicle please fax a copy of the front of the MSO.  For each used vehicle please fax a copy of the title.

# SunTrust

**Date:** 5-12-04

*Funding Form*

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | Chev | 1500 | U | 2GCEC19T9Y1161170 | KL804 | 13075.00 |
| 2 | 03 | Ford | F150 | U | 1FTRW07333KC59113 | 6805A | 23000.00 |
| 3 | 02 | Lexus | RX300 | U | JT6GF10U020143445 | KL851 | 27200.00 |
| 4 | 03 | Ford | F250 | U | 1FTNX21F23EA54826 | KL859 | 26750.00 |
| 5 | 03 | Cadi | Escalade | U | 1GYEC63T23R201607 | KL864 | 34500.00 |
| 6 | 02 | Jaguar | S-Type | U | SAJDA01C7YFC25726 | KL8873 | 18050.00 |
| 7 | 00 | Toy | Camry | U | 4T1BG28K0YU672607 | KL857 | 9425.00 |
| 8 | 02 | Ford | F150 | U | 1FTRX17272KA54518 | KL808 | 10650.00 |
| 9 | 00 | Lexus | RX300 | U | JT6GF10U800073372 | KL804 | 21700.00 |
| 10 | 01 | Volvo | S600 | U | YV1RS53YX12005833 | KL811 | 19500.00 |
| 11 | 01 | GMC | Sierra | U | 2GTEC19V811265774 | KL844 | 16075.00 |
| 12 | 01 | Ford | F150 | U | 1FTNW21SN1EB47S50 | KL816 | 18550.00 |
| | | | | | | **Total Funded** | $ 245,575.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

**Date:** 5-5-04

*Payoff Form*

**Client: Big Oaks Buick Pontiac GMC**
**Customer # 0050195914 /Plan # 18, 26, 42, 59**
**DDA Account # 005600309001**

Please payoff the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | Last six of Vin Number | Stock Number (optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 03 | Ford | F350 | Used | C02001 | 64070A | 23800.00 |
| 2 | 02 | Lexus | ES300 | Used | 039815 | K6886 | 25200.00 |
| 3 | | | | | | | |
| 4 | | | | | | | |
| 5 | | | | | | | |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | Total Paid | 49000.00 |

Please e-mail this form to  NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.

# SUNTRUST

**Date:** 2-17-04

*Payoff Form*

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 005019S914 / Plan # 18,26,42,59**
**DDA Account # 005600309001**

Please payoff the vehicles described below for which we hold good title:

|    | Year | Make | Model | New or Used | Last six of Vin Number | Stock Number (Optional) | Floorplan Amount |
|----|------|------|-------|-------------|------------------------|-------------------------|------------------|
| 1  | 02 | Chev | | U | 104605 | K7047 | 19,700 |
| 2  | 03 | Toyota | Sequoia | U | 177627 | K6680 | 30,700 |
| 3  | 98 | Honda | Civic | U | 104122 | K6776 | 8335 |
| 4  | 01 | Ford | Explorer | U | D57533 | K6674 | 14650 |
| 5  | 01 | Mits | Eclipse | U | 18005G | K6869 | 8850 |
| 6  | 00 | Kia | Sportage | U | 102182 | K6566 | 8865 |
| 7  | 02 | Ford | F250 | U | D04967 | K6549 | 25750 |
| 8  | 03 | Cad | Escalade | U | 105189 | K6865 | 38700 |
| 9  | 01 | Buick | Lesabre | U | 457054 | K3158A | 7425 |
| 10 | 04 | GMC | 3500 | N | 194333 | L6410G | 325777.78 |
| 11 | 04 | Buick | Century | U | 155416 | 7057 | 11700 |
| 12 | 99 | Ford | Ranger | U | 867783 | 6503 | 7800 |
| | | | | | | **Total Paid** | **$ 215,777.78** |

**SunTrust**

*Funding Form*

Date: 4-30-09

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 005019591 4 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 08 | Merz | ML320 | U | 4JGBB35E9NA155149 | K6728 | 21300.00 |
| 2 | 01 | Lexus | ES300 | U | JT8BF28G510336737 | K6440 | 12300.00 |
| 3 | | | | | | | |
| 4 | 08 | Honda | Accord | U | 1HGCG22535XA003640 | K6598 | 13000.00 |
| 5 | 02 | Ford | F150 | U | 1FTRW07605KB557479 | K6660 | 16475.00 |
| 6 | 00 | Ford | F150 | U | 1FT2X07292K340710 | K6663 | 11750.00 |
| 7 | 01 | Ford | F250 | U | 1FTNW21F21ED38796 | 6637 | 23375.00 |
| 8 | | | | | | | |
| 9 | 02 | Chev | Corvette | U | 1G1NY22G885114327 | K6682 | 31800.00 |
| 10 | 01 | Merz | E430 | U | WDBJF70J1B334608 | K6714 | 30950.00 |
| 11 | 03 | Ford | F150 | U | 2FTRX07353CA44620 | K6739 | 16950.00 |
| 12 | 03 | Cad | Escalade | U | 1GYEK63013R208635 | K6754 | 40635.00 |
| | | | | | | **Total Funded** | **$ 218,335.00** |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SUNTRUST

**Funding Form**

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

**Date:** 5-12-04

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | Chev | 1500 | U | 2GCEC19T9110417Q | KL6804 | 13075.00 |
| 2 | 03 | Ford | F150 | U | 1FTRW07133KC59113 | 6805A | 23000 |
| 3 | 02 | Lexus | RX300 | U | JT6GF10UX20143445 | KL6851 | 27200.00 |
| 4 | 03 | Ford | F250 | U | 1FTNX21F23EA54820 | KL6852 | 26750.00 |
| 5 | 02 | Cad | Escalade | U | 1GYEC63T22R101607 | KL6804 | 34500.00 |
| 6 | 00 | Jaguar | S-Type | U | SAJDA01CYYFL25126 | KL6875 | 18250.00 |
| 7 | 00 | Toy | Camry | U | 4T1BG22K1YU672607 | KL6857 | 7925.00 |
| 8 | 02 | Ford | F150 | U | 1FTRX17LX2KA54518 | KL6808 | 16650.00 |
| 9 | 00 | Lexus | RX300 | U | JT6GF10U6006737Q | KL6806 | 21700 |
| 10 | 00 | Volvo | S60 | U | YV1RS53D6Y2005833 | KL6044 | 14500.00 |
| 11 | 01 | GMC | Sierra | U | 2GTEC19U811265774 | KL6044 | 16075.00 |
| 12 | 01 | Ford | F150 | U | 1FTNW21S01EB47250 | KL6916 | 18550.00 |
| | | | | | | **Total Funded** $ | 245,575.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

*Funding Form*

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

**Date:** 4-30-04

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | merz | ML320 | 4 | 4JGAB54E2YA155149 | K6728 | 21300.00 |
| 2 | 01 | Lexus | ES300 | 4 | JT8BF28G510330737 | K6910 | 18300.00 |
| 3 | | | | | | | |
| 4 | 00 | Honda | Accord | 4 | 1HGCG22SXYA003040 | K6598 | 13,000.00 |
| 5 | 02 | Ford | F150 | 4 | 1FTRW07605KC57479 | K6601 | 16475.00 |
| 6 | 00 | Ford | F150 | 4 | 1FTRX07J3YKC34070 | K6603 | 11750.00 |
| 7 | 01 | Ford | F350 | 4 | 1FTNW21F21ED38776 | 6637 | 23375.00 |
| 8 | | | | | | | |
| 9 | 02 | Chev | Corvette | 4 | 1G1YY22G8851143 27 | K6682 | 31800.00 |
| 10 | 01 | merz | E430 | 4 | WDBJF70J11B334608 | K6714 | 30950.00 |
| 11 | 03 | Ford | F150 | 4 | 2FTRC07353CA44620 | K6739 | 16950.00 |
| 12 | 03 | Cad | Escalade | 4 | 1GYEK63N13R308635 | K6754 | 40625.00 |
| | | | | | | Total Funded | $ 218,225.00 |

Please e-mail this form to  NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.  For each new vehicle please fax a copy of the front of the MSO.  For each used vehicle please fax a copy of the title.

# SunTrust

Funding Form

**Date:** 5-12-04

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 005019591 4 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| # | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|------|------|-------|-------------|------------------------|-------------------------|------------------|
| 1 | 00 | Chev | 1500 | U | 2G1EC19T9Y1164170 | Kl6804 | 13075.00 |
| 2 | 03 | Ford | F150 | U | 1FTRW07333KC59113 | 68051A | 23000 |
| 3 | 03 | Lexus | RX300 | U | JT5GF10UX030143445 | Kl6851 | 27200 |
| 4 | 03 | Ford | F250 | U | 1FTNX21F73EA54826 | Kl6853 | 26750 |
| 5 | 03 | Cad | Escalade | U | 1GYEC63T33R101607 | Kl8864 | 34500 |
| 6 | 03 | Jaguar | S Type | U | SAJWA01CYFC35526 | Kl6893 | 18050 |
| 7 | 04 | Toy | Camry | U | 4T1BG22KYV673607 | Kl6857 | 7925 |
| 8 | 02 | Ford | F150 | U | 1FTRX17272KA54518 | Kl6808 | 16650 |
| 9 | 00 | Lexus | RX300 | U | JT6GF10U8Y0073713 | | |
| 10 | 01 | Volvo | S60 | U | YV1RS53D012005832 | Kl6711 | 19500 |
| 11 | 01 | GMC | Sierra | U | 2GTEC19U811264774 | Kl6744 | 16075 |
| 12 | 01 | Ford | F150 | U | 1FTNW21S01EB45456 | Kl6916 | 18550 |
|   |    |      |       |   |                   | **Total Funded** | $ 245,575.00 |

Please e-mail this form to NFL.CGSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

**Funding Form**

Date: 4-30-04

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 04 | merz | ML500 | 4 | 4JGDA54E20A155149 | K6728 | 21300.00 |
| 2 | 01 | Lexus | ES300 | 4 | JT8BF28G510330737 | K6910 | 12300.00 |
| 3 | | | | | | | |
| 4 | 00 | Honda | Accord | U | 1HGCG2254XA003640 | K6558 | 13,000.00 |
| 5 | 02 | Ford | F150 | U | 1FTRW07652KB57479 | K6601 | 16475.00 |
| 6 | 00 | Ford | F150 | U | 1FT2X07xyK340710 | K6613 | 11750.00 |
| 7 | 01 | Ford | F150 | U | 1FTNW21F21EG38776 | 6637 | 23375.00 |
| 8 | | | | | | | |
| 9 | 02 | Chev | Corvette | U | 1G1YY22G885114327 | K6682 | 31800.00 |
| 10 | 01 | merz | E430 | U | WDBJF70J11B334608 | K6714 | 30750.00 |
| 11 | 03 | Ford | F150 | U | 2FTRX07353CA44620 | K6739 | 16950.00 |
| 12 | D3 | Cad | Escalade | U | 1GYEK63013R208635 | K6756 | 40625.00 |
| | | | | | | Total Funded | $ 218,325.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

**SunTrust**

*Funding Form*

Date: _4-30-09_

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 08 | Merz | ML320 | U | 4JGBB54E9NA155149 | K6728 | 21300.00 |
| 2 | 01 | Lexus | ES300 | U | JT8BF28G510330737 | K6710 | 12300.00 |
| 3 | | | | | | | |
| 4 | 08 | Honda | Accord | U | 1HGCG22S5XA003640 | K6554 | 13,000.00 |
| 5 | 02 | Ford | F150 | U | 1FTRW07L05JKA57479 | K6601 | 16475.00 |
| 6 | 00 | Ford | F150 | U | 1FT2X07J9YKB40710 | K6603 | 11750.00 |
| 7 | 01 | Ford | F350 | U | 1FTNW21F21EB38796 | 6637 | 23375.00 |
| 8 | | | | | | | |
| 9 | 02 | Chev | Corvette | U | 1GINY22G885114327 | K6683 | 31800.00 |
| 10 | 01 | Merz | E430 | U | WDBSF70J11B334608 | K6214 | 30950.00 |
| 11 | 03 | Ford | F150 | U | 2FTRX07353CA44620 | K6739 | 16850.00 |
| 12 | 03 | Cad | Escalade | U | 1GYEK63013R208685 | K6754 | 40625.00 |
| | | | | | | Total Funded | $ 218,235.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.  For each new vehicle please fax a copy of the front of the MSO.  For each used vehicle please fax a copy of the title.

# SunTrust

*Funding Form*

Date: 4-30-04

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | merz | ML320 | U | 4JGAB54E9YA155149 | K6728 | 21300.00 |
| 2 | 01 | Lexus | ES300 | U | JT8BF28651033073? | K6710. | 12300.00 |
| 3 | | | | | | | |
| 4 | 00 | Honda | Accord | U | 1HGCG22S5YA003640 | K6598 | 13,000.00 |
| 5 | 02 | Ford | F150 | U | 1FTRW07652KB57479 | K6601 | 16475.00 |
| 6 | 00 | Ford | F150 | U | 1FT?X07?9YKB40710 | K6613 | 11750.00 |
| 7 | 01 | Ford | F350 | U | 1FTNW21F31E?387?6 | 6637 | 23375.00 |
| 8 | | | | | | | |
| 9 | 02 | Chev | Corvette | U | 1G1YY22G825114327 | K6682 | 31800.00 |
| 10 | 01 | merz | E430 | U | WDBJF70J11B234608 | K6714 | 30950.00 |
| 11 | 02 | Ford | F150 | U | 2FTRF07353CA44?2D | K6739 | 16950.00 |
| 12 | 03 | Cad | Escalade | U | 1GYEK63?13?308635 | K6754 | 40625.00 |

| | Total Funded | $ 218,225.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

# SunTrust

Funding Form

Client: Big Oaks Buick / Pontiac / GMC Truck
Customer # 0050195914 / Plan # 18,26,42,59
DDA Account # 0056000309001

Date: _____ 5/18/04

Please fund the vehicles described below for which we hold good title:

|  | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 03 | mazda | MPV | U | JM3LW28A730353268 | K1280 | 18050.00 |
| 2 | 01 | Lexus | RX300 | U | JT6GF10U310112330 | K7342 | 23700.00 |
| 3 | 00 | Chev | Tahoe 4H | U | 1GNEK13R9YR174356 | K7333 | 16775.00 |
| 4 | 04 | Lexus | RX330 | U | 2T2GA31UX4C001IX | K1294 | 35800.00 |
| 5 | 03 | Cadillac | CTS | U | 1G6DM57N930148465 | 7327 | 26900.00 |
| 6 | 02 | Chev | Cavalier | U | 1G1JC524025372043 | 7192A | 6750.00 |
| 7 | 01 | Dodge | Ram | 4 | 1B7HC16X91S191043 | 7415SA | 7925.00 |
| 8 |  | Mercedes | CLK500 | U | WDBTK70G4YT032755 | K1344D | 28250.00 |
| 9 | 00 | Mercedes | CLK430 | U | WDBLK70G6YT034855 | K6303 | 29850.00 |
| 10 | 03 | Lexus | RL300 | U | JTJGF10U130163425 | K6274 | 30200.00 |
| 11 | 04 | GMC | Envoy | N | 1GKDS13S642359902 | 64274 | 32856.15 |
| 12 |  |  |  |  |  |  |  |
|  |  |  |  |  |  | Total Funded | $257556.15 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding.  For each new vehicle please fax a copy of the front of the MSO.  For each used vehicle please fax a copy of the title.

# SunTrust

Funding Form

Date: 5-12-04

**Client: Big Oaks Buick / Pontiac / GMC Truck**
**Customer # 0050195914 / Plan # 18,26,42,59**
**DDA Account # 0056000309001**

Please fund the vehicles described below for which we hold good title:

| | Year | Make | Model | New or Used | VIN Number (17 digits) | Stock Number (Optional) | Floorplan Amount |
|---|---|---|---|---|---|---|---|
| 1 | 00 | Chev | 1500 | U | 2G1QEC16T9V11041170 | Kl6804 | 13075.00 |
| 2 | 02 | Ford | F150 | U | 1FTRW01333KC59113 | 6805A | 23000 |
| 3 | 02 | Lexus | RX300 | U | JT16F10UX20143145 | Kl6851 | 27200 |
| 4 | 03 | Ford | F250 | U | 1FTNX21F23EA54826 | Kl6859 | 26750 |
| 5 | 02 | Cad | Escalade | U | 1GYEC63T22R212607 | Kl6864 | 34500 |
| 6 | 02 | Jaguar | S-Type | U | SAJWA01CV1FL257526 | Kl6895 | 18050 |
| 7 | 00 | Toy | Camry | U | 4T1BG22K1YU672607 | Kl6857 | 9425 |
| 8 | 02 | Ford | F150 | U | 1FTRX17X72KA54518 | Kl6808 | 16650 |
| 9 | 00 | Lexus | RX300 | U | JT16F10U600007379 | Kl6806 | 17700 |
| 10 | 01 | Volvo | S60 | U | YV1RS53D612005833 | Kl6711 | 19500 |
| 11 | 01 | GMC | Sierra | U | 2GTEC19U811267774 | Kl6844 | 16075 |
| 12 | 01 | Ford | F150 | U | 1FTNW21S01EB49250 | Kl6916 | 18550 |
| | | | | | | Total Funded | $ 245575.00 |

Please e-mail this form to NFL.CCSC.Floorplan@suntrust.com or fax form to 407-762-3045 or 1-877-607-0374 prior to 2:00PM for same day funding. For each new vehicle please fax a copy of the front of the MSO. For each used vehicle please fax a copy of the title.

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


**JOHN C. GIOVANETTI,**
**Plaintiff,**

**vs.**                                          **Case No.** 8:07-CR-295-127-MAP

**UNITED STATES OF AMERICA,**
**Defendant**

_____/


## AFFIDAVIT OF ELISA BLACKBURN

BEFORE ME, the undersigned authority, personally appeared **ELISA BLACKBURN** who after being first duly sworn, depose and says:

1. I am over the age of 18 years, competent and authorized to make this affidavit.

2. This affidavit is based on personal knowledge.

3. I have a Bachelor of Science degree in Secondary Education from the State University of New York in Plattsburg, New York, and have earned credits toward a Master of Science degree in political science.

4. I have been significantly involved in the day to day financial operations and activities of dealerships associated with various automotive manufacturers for the past 31 years, including working for 15 years in the position of Comptroller of automobile dealerships which sold both new and used cars. In such roles, I became very familiar with numerous software programs designed to handle all accounting aspects of an automobile dealership. Such programs would create and maintain all of the accounting journals and statements typically associated with a retail business, including tracking inventory and costs of goods sold, performing bank reconciliations, and producing profit and loss statements.

5. Among the auto dealer accounting software programs that I am well acquainted with, having worked with such programs for more than seven years, is the program created and distributed by Reynolds & Reynolds ("R&R"). The R&R program tracks inventory, profit and loss, rebates, insurance expenses, holdbacks, receivables, and payables (among numerous other functions). In addition to performing accounting work for dealership with the R&R system for more than seven years, I also attended numerous seminars and educational programs created to train people using the R&R system, in order to become highly proficient in using the R&R system.

EXHIBIT B

6.I first met John Giovanetti in November 2006, when Mr. Giovanetti was the General Manager of Milledgeville Toyota. Upon the recommendation of the Service Manager of Milledgeville Toyota, I was interviewed by Mr. Giovanetti for the position of Comptroller. As a result of that interview, I was offered and accepted the position of Comptroller. I began working as Comptroller for Milledgeville Toyota in November 2006.

7.As the Comptroller of Milledgeville Toyota, my duties including overseeing, on a daily basis, all bank activities of the dealership, the closing (or completion) of all monthly accounting reports, and the preparation and submission of all financial statements for both Milledgeville Toyota and Milledgeville Chevrolet.

8.I was working at Milledgeville Toyota in August 2007 when federal law enforcement agents came to the dealership looking for Mr. Giovanetti. Upon Mr. Giovanetti's return to the dealership from a meeting with GMAC, Mr. Giovanetti was taken into custody. Mr. Giovanetti returned to work that afternoon. Approximately one week after the arrest of Mr. Giovanetti, when news of the arrest was published in automotive industry trade journals, Mr. Giovanetti was fired and escorted from the dealership by local law enforcement authorities.

9.Several months after his arrest, Mr. Giovanetti asked me if I knew any personnel at R&R who could explain the R&R system and its capabilities, as the R&R system had been used by Big Oaks Buick Pontiac ("BOBP"), the dealership formerly owned by Mr. Giovanetti.

10.I told Mr. Giovanetti that I did not know anyone who worked for R&R.

11.Thereafter, Mr. Giovanetti asked if I would be willing to assist him and his attorney in reviewing journals and other accounting records created by BOBP during the normal course of business. I told Mr. Giovanetti that I did not have a lot of time available at that moment. But would help him when I could.

12.In response, Mr. Giovanetti asked if I would be willing to speak to a forensic accountant (Eric Sholtz) from the certified public accounting firm (W. H. Simon & Co.) hired by Mr. Giovanetti's defense attorney (John Fitzgibbons), as the accounting firm had very little knowledge of accounting practices related to automotive dealerships.

13. In December 2007, I spoke with Eric Sholtz, the forensic accountant at W. H. Simon & Co., the firm retained by Mr. Giovanetti's defense attorney, John Fitzgibbons. During that telephone conversation, Mr. Sholtz and I discussed the R&R system and what the chances were of someone altering or manipulating the accounting records in the R&R system, particularly in an effort to cover-up or hide the theft of funds from a dealership using the R&R system. Mr. Sholtz then asked me to provide him with a list of ways in which someone could steal from an auto dealership. In the short, 30-minute conversation I had with Mr. Sholtz, he did not demonstrate much knowledge about accounting as it related to an auto dealership and no knowledge as to how to investigate fraudulent

activities at an auto dealership. Mr. Sholtz only had one telephone conversation with me and never asked me to meet with him and review the accounting records of BOBP.

14. In December 2007, Mr. Giovanetti asked me to assist in a review of hard copies of accounting records from BOBP. I informed Mr. Giovanetti that I had to be compensated for my time. He contacted Mr. Fitzgibbons of this and I received a $2,000.00 retainer from Mr. Fitzgibbons. Mr. Giovanetti and I preceded to go over the hard copies of accounting and the book keeping records. I found quite a few discrepancies. During that time Mr. Giovanetti got a phone call from Mr. Fitzgibbons. He asked Mr. Fitzgibbons to speak with me as I was right there. He refused, citing attorney-client privilege. Even with Mr. Giovanetti's verbal ok, Mr. Fitzgibbons refused to talk to me and quickly got off the phone with Mr. Giovanetti. I thought that was very strange.

15. I informed Mr. Giovanetti that what we really needed were the hard drives from the R&R system to substantiate the discrepancies I had found. Therefore, on several occasions, starting in the spring of 2008 both Mrs. Giovanetti and I contacted R&R in efforts to get hard files from them. We relayed the status of Mr. Giovanetti and his case hoping that they might realize the sense of urgency and help us. On those occasions I was given different reasons why I could not have such access. At first I was told that the records no longer existed. The story from R&R then changed stating that they would not provide records other than pursuant to a court order.

16. While we continued working on this case, we were dead locked without the R&R system. In the fall of 2008 Mrs. Giovanetti was finally given permission to go to the storage unit. In November of 2008 we met the FBI agent at the storage unit. We were able to find several boxes containing BOBP accounting records. The records were not logically organized within the storage unit, and I was unable to confirm that a complete set of records of any year was available. We were able to locate seven R&R back up tapes, some were dated, some were not.

17. Despite the state of the records, I was able to retrieve and review accounting entries, checks, journals, ledgers, schedules, bank reconciliation and other accounting records of BOBP such that I could reach a conclusion regarding the records and what they reflected. My review was done over a period of weeks and exceeded several hundred hours. Unfortunately we were still unable to find a way to read the back up tapes that we know have the accounting information BOBP that would be critical in proving theft from BOBP. R&R would still not cooperate with us. Since these tapes are written over, we could not say that the dates on the tape boxes coincided with the actual tapes. The only way we could ascertain which dates were on the tapes would be to load them on the system where they would be read.

18. From my review of the BOBP accounting records, I could determine that, during the time that Scott Littlejohn was the Controller of BOBP, those records were not kept in the normal manner I would expect for any new car dealership. Entries that should have been made on a daily basis were not so posted. Errors were not corrected on a timely basis, if at all. Certain accounts contained adjustments, apparently made throughout the year,

when such adjustments either should not have been made or should only have been made as part of the end of year review done pursuant to standard accounting practices. The records I reviewed hardly disclosed any adjustments that would be considered standard accounting records. The year end accountant's entries were made on Mr. Littlejohn's say so only. Mr. Roth probably knew of them because he was the General Manager. This was highly irregular because there was nobody to dispute him. Mr. Giovanetti should have been made aware of these gross adjustments year ends was performed. The CPA should have confirmed these adjustments in a year end conference with Mr. Giovanetti. Littlejohn and Roth had an unobstructed path for their manipulations.

19. As an example, entries were routinely made that had the effect of inflating the profit of BOBP during a particular month. These records were then reversed at the beginning of the following month. Such a pattern would lead me to believe that the entries that inflated the profits were done in order to hide the real financial state of BOBP, especially from anyone that did not review the various journals and statements, but only review a general or compiling statement, such as a profit and loss statement. Profit and loss statements, in essence, contain information derived from numerous activities within an accounting period (such as a calendar month or year), but only reflect the total end of period result and do not disclose the details set out in the journals and other schedules.

20. I located numerous records that showed that bank statements were not reconciled to the BOBP accounting records on a regular basis. These same records would reflect checks as still outstanding when those checks had, in fact, cleared the bank and been paid. Other checks were paid to third parties for which no records could be matched and that appeared very suspicious in nature.

21. Because of the manner in which the R&R system operates, if I were able to review the BOBP records created by the R&R system, I would be able to identify significantly more of the information regarding the BOBP records, including who made entries and changes to those records, and when those entries and changes were made. Therefore, I believe it is critical that someone is able to subpoena the R&R records and perform a detailed review in order to disclose any improper manipulation of the R&R system.

22. It is my opinion as a professional comptroller with more than 30 years of experience in the automotive dealership business that the state of the BOBP accounting records was intentional and done so as to create chaos, hide entries, and confusion that would allow the true state of the financial situation of BOBP to be hidden from all but the person manipulating the accounting records. Further, it is my opinion that Mr. Giovanetti did not and could not have known what was going on in relation to the "reflooring" of automobiles at BOBP from the financial information given to him by Littlejohn. It is also my opinion that it would be highly unlikely that Mr. Giovanetti or other dealer principle would have been in a position to be aware of the "reflooring."

23. In contrast, knowing the duties and job functions of Scott Littlejohn and Kelly Roth, I have little reason to believe anything they would have said, especially seeing the shape of the accounting records of BOBP, which, as I stated, I believe were initially kept in

disarray in order to hide fraudulent activities begin carried out by Scott Littlejohn and Kelly Roth.

24. For the length of time that Roth and Littlejohn worked at BOBP and the amount of trust Mr. Giovanetti had in them, it is my professional opinion that Roth and Littlejohn had little concern for the dealership and purposely deceived Mr. Giovanetti with their false accounting procedures. I truly believe Mr. Giovanetti wanted the best for his dealership and that he thought he had the best people in key positions to perform the duties they were hired for. Unfortunately this was not the case. It is my professional opinion after working hundreds of hours on the books and accounting records of BOBP that Mr. Roth and Mr. Littlejohn had an agenda of their own and were nothing but thieves.

25. In conclusion, the owner/dealer of a car dealership hires trusted employees to manage all of the departments of the dealership. He has a parts department that sells and purchases hundreds of thousands of parts per month, but he does not personally sell or purchase these parts. He has a sales department that sells and purchases millions of vehicles per month in conjunction with a finance and insurance department that contract the cash/finance with his customers, yet he has trusted employees that handle these transactions.

26. Every service, part, car, truck, credit life policy, extended warranty, and others are entered into the R&R system. The dealer has a finance and insurance department that arranges the cash and finance contrast with his customers, making sure that every entry is correct. As stated earlier in this affidavit, all of this data, inventory, cost of goods sold, bank reconciliation, and profit and loss statements are just a few of the responsibilities of the accounting department. An owner/dealer hires trusted, competent employees to handle the accounting functions. Owner/dealers are interested in SALES, cars, trucks, service, parts. Floor planning cars and trucks is an accounting function. In my thirty plus years I have never seen an owner/dealer floor plan vehicle. Trusted competent account management handles this function.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Elisa Blackburn

The foregoing instrument was acknowledge before me this _23rd_ day of ~~August~~ December, 2009, by Elisa Blackburn, ___ who is personally known to me or ___ has produced _Drivers License_ as identification, and deposes and says that she has read this Affidavit and that the facts contained herein are true and correct. Affiant did/did not take an oath.

_____
NOTARY PUBLIC, State of ~~Florida~~ Georgia
Victoria F. Allen

Printed Name of Notary
My Commission Expires: 2/15/2010

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**UNITED STATES OF AMERICA,**
          **Plaintiff,**                    **CASE NO.    8:07-CR-295-127-MAP**

**v.**

**JOHN C. GIOVANETTI,**
          **Defendant.**
_____/


### AFFIDAVIT OF MARY GIONVANETTI

BEFORE ME, the undersigned authority, personally appeared **MARY GIOVANETTI** who

after being first duly sworn, depose and says:

1.       I am over the age of eighteen years, competent and authorized to make this affidavit.

2.       This affidavit it based on personal knowledge.

3.       My husband, John Giovanetti was the owner of Big Oaks Buick Pontiac GMC from

         January 1998 till October 2004

4.       As the owner's  wife I would spend approximately three to four days a week at the

         dealership, and during those times I became quite familiar with the documents that

         Lisa Agnew would complete, and during those times I became quite familiar with her

         writings as well as the other employees in the office.

5.       I am extremely familiar with the handwriting of Lisa Agnew and as such, I can state

         truthfully that the **funding forms** labeled Q-1 through Q-19 are indeed the

         handwriting of Lisa Agnew, due to having seen her writings on numerous occasions.

**FURTHER AFFIANT SAYETH NOT.**


EXHIBIT C

*Mary Giovanetti*

Mary Giovanetti

    The foregoing instrument was acknowledged before me this 23rd day of December, 2009, by Mary Giovanetti, who is personally known to me or has produced *Drivers License* as identification and who did take an oath.

Notary Public:
Sign: *Victoria F. Allen*
Print: Victoria F. Allen
Commission No. _____

My Commission expires: 2/15/2010



**FLORIDA DEPARTMENT OF LAW ENFORCEMENT**
**INVESTIGATIVE REPORT**

This report is predicated upon the joint investigation with the Federal Bureau of Investigation concerning alleged fraud perpetrated by John Giovanetti, past owner of Big Oaks Buick - Pontiac - GMC, Inc.

On Thursday, January 19, 2006, Special Agent (SA) William Miles traveled to Lake Wales, Florida, in order to locate and interview Deborah Cheney, a past employee of Big Oaks. Ms. Cheney's name surfaced earlier in this investigation as a person that might have information concerning this case.

SA Miles met with Ms. Cheney at her residence at approximately 1500 hours. This interview was not tape recorded and this investigative report is written based upon rough notes taken by SA Miles. Prior to the interview, SA Miles displayed his FDLE credentials for inspection and provided a brief overview of the investigation and the reason for this interview. Ms. Cheney agreed to be interviewed at this time.

SA Miles asked Ms. Cheney to explain her employment background with Big Oaks. Ms. Cheney stated that she worked at the Dealership from 1998 to 2002 and served in positions of Account Payable, Payroll and Office Manager. Ms. Cheney stated that she worked for a brief time with Scott Littlejohn, who she knew to be the Comptroller, Kelly Roth, who she knew to be the General Manager and John Giovanetti, who she knew to be the Owner.

SA Miles asked Ms. Cheney if she knew the terms "sale out of trust" and/or "re-floored inventory". Ms. Cheney stated that had never heard these terms and didn't know their meaning.

SA Miles explained the process and meaning of "sale out of trust" and "re-floored inventory" and asked Ms. Cheney if she had any knowledge of these activities while at the Dealership. Ms. Cheney stated that she knew nothing of such activity.

Ms. Cheney stated that she often worked with Craig Hutchinson of SunTrust Bank and would send via FAX information and paperwork concerning sales of vehicles. Ms. Cheney remembered that this had to be done within a five day period from the time of sale of the vehicle. When asked, Ms. Cheney stated that she was never instructed to hold up this process or change any information contained on the documents.

| Case Number:LA-11-0053 | Serial #:11 |
|---|---|
| Author:Miles, William H | Office:Lakeland |
| Activity Start Date:01/19/2006 | Activity End Date:01/19/2006 |
| Approved By:Waller, David R | |
| Description:Interview of Deborah Kay Cheney. | |

THIS REPORT IS INTENDED ONLY FOR THE USE OF THE AGENCY TO WHICH IT WAS DISSEMINATED AND MAY CONTAIN INFORMATION THAT IS EITHER PRIVILEGED OR CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE YOUR AGENCY.

EXHIBIT D

| Case Number: | LA-11-0053 |
| IR Number: | 11 |

Ms. Cheney was asked if she knew the term "going to the closet"?  Ms. Cheney stated that she never heard this term used.

Ms. Cheney was asked to describe the financial condition of the Dealership during her employment and she described it as "pretty good".

Ms. Cheney was asked if she prepared financial statements for the dealership and she stated that she had.  When asked, Ms. Cheney stated that she was never asked to change these figures.  Ms. Cheney added that her only complaint was with the end of the month statements and that is was not unusual for Kelly Roth or John Giovanetti to instruct her to remove an expense or to post an expense to a different month.

Ms. cheney was asked if she knew of any questionable expenses paid by the dealership.  Ms. Cheney stated that GIOVANETTI's race boat was paid for by the dealership and charged to advertisement because the dealership's name was displayed on the side of this boat.  Ms. Cheney also knew that engine expenses and parts expenses for this boat were charged to the dealership's parts department and that the boat mechanic's salary was paid by the dealership.  Ms. Cheney stated that Mrs. Giovanetti was paid a regular salary, but only reported for work at the dealership "from time to time".  Ms. Cheney stated that in her estimation, Kelly Roth did "very little" work at the dealership but was paid a very large salary.  Ms. Cheney described Kelly Roth as "John's golden boy".  When asked, Ms. Cheney stated that she did not know of any money paid by the dealership for the property owned by Giovanetti and Roth in Wauchula, Florida.

Ms. Cheney indicated that she knew of loans to the dealership by Judge Andrews and an Accountant named "Ben" (LNU), but did not know the exact amount of these loans.  Ms. Cheney states that monthly checks were sent to Judge Andrews and "Ben" as re-payments on these loans.

Ms. Cheney was asked if the dealership was in a money crunch.  Ms. Cheney stated that the dealership always had it's "slow season", that the road construction in front of the dealership didn't help and that Giovanetti liked to play more than work.  This notwithstanding, Ms. Cheney still thinks that the dealership was in "good shape".

When asked, Ms. Cheney stated that she had no knowledge of any scheme to defraud money from the SunTrust Bank and that she knew of no illegal activities taking place at the dealership.

At this point the interview with Ms. Cheney was brought to a close.

APR-21-2005  12:39        FBI LAKELAND                           863 683 4894      P.02

FD-302 (Rev 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**


Date of transcription    04/20/2005

     LISA ANNE AGNEW, white female, date of birth November 29, 1959, Social Security Account Number 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, place of birth Macon, Georgia, 473 Brookdale Avenue Northeast, Palm Bay, Florida 32907, (321) 956-0059, was advised as to the identity of the interviewing agent, as well as the identity of Special Agent (SA) William Miles, Florida Department of Law Enforcement (FDLE), and the nature of the interview. AGNEW was interviewed at her residence as indicated above, and provided the following information:

     AGNEW is currently employed at OSMAN LINCOLN-MERCURY, 625 E. Nasa Boulevard, Melbourne, Florida 32901, (321) 725-1100, having obtained her position as Office Manager on February 15, 2005. AGNEW moved to the Melbourne area from Bartow, Florida, on February 4, 2005, as her husband, LEROY, accepted a move with his company, L. ROBERT CAMPBELL & ASSOCIATES, an architectural engineering firm.

     AGNEW was provided the names of various automobile dealerships to consider for potential employment by KEN ROSENFIELD, the Receiver in the matter of BIG OAKS BUICK PONTIAC GMC, INC. (BOBP), Bartow, Florida (BOBP is the former employer of AGNEW, from December, 2001, through the time of seizure of BOBP, on February 11, 2005). AGNEW advised that she interviewed with a few, and landed a position at OSMAN as the Office Manager. AGNEW has no formal Accounting degree or background, other than on the job training, and is not a Certified Public Accountant.

     AGNEW began her employment with BOBP in approximately December, 2001, as a Warranty Administrator. This position entailed the collection of monies from General Motors for warranty period work done by BOBP. Within approximately two months of hiring on at BOBP, AGNEW was promoted to the Accounting area of BOBP, located on the second floor of the dealership in Bartow. At that time, in addition to her continued Warranty Administrator work, AGNEW also began handling Accounts Receivable, Accounts Payable, and Warranty Cancellation functions. AGNEW continued to handle these duties for approximately one to one and one-half years.

     Subsequently, after approximately eight months from her hire on date, in the summer of 2002, AGNEW became the Title and Tag Clerk for BOBP as well. This position entailed the processing of

---

Investigation on   4/19/05   at  PALM BAY, FLORIDA

File #  29B-TP-67943                          Date dictated  4/20/05

**EXHIBIT E**

APR-21-2005  12:39        FBI LAKELAND                    863 683 4894     P.03

FD-302a (Rev. 10-6-95)

29B-TP-67943

Continuation of FD-302 of ___LISA ANNE AGNEW_____ ,On _4/19/05____ , Page ___2___

vehicle sales at BOBP, and completing the proper documentation for
applicable tags and titling on the sold vehicles.

The documentation described above was handled either
through what AGNEW termed "in-house CVR" (Computerized Vehicle
Registration), which was electronically tied in to the Department
of Motor Vehicles in Tallahassee, Florida, or through physically
walking the paperwork through tag offices located in Bartow, or
Lakeland, Florida.

AGNEW advised that at a point in 2003, at about the same
time when TAMMY BURTON took over the Payroll and Human Resources
functions at BOBP, she (AGNEW) took over the Billing function at
BOBP. This involved pulling contracts and paying off floor plan
loans, in addition to her work in the Tag and Title area. AGNEW
advised that she wrote up the floor plan loans, and provided the
documentation to BOBP Controller EDWARD SCOTT LITTLEJOHN. AGNEW
provided the list of floored vehicles to LITTLEJOHN approximately
once or twice per week, so that LITTLEJOHN had a record of what was
sold.

Within approximately the last year to year-and-a-half
prior to BOBP's bankruptcy in February, 2005, AGNEW advised that
although BOBP never had any money, during this time frame, things
were really bad. Corporate monies were being spent on Owner JOHN
GIOVANETTI's personal boat, to include monthly payments, as well as
various parts purchases. The monthly boat payment was approximately
$2,700 per month. Payments were also being made on GIOVANETTI's
motorcycle, and related insurances. Further, GIOVANETTI's American
Express bill was running anywhere from $8,000 to $20,000 per month,
of which, according to AGNEW, minimal amounts were for the benefit
of BOBP. GIOVANETTI also had a Capitol One credit card that had
varying expense amounts on it, as well. In addition, the recently
opened BOBP Car and Truck Center in Lakeland was incurring expenses
at approximately $27,000 per month, which BOBP paid for. All this
was happening at the same time that GIOVANETTI was considering
moving the dealership to US 98 in Bartow, and purchasing new land
there.

AGNEW advised that the cash flow situation created a work
environment that "sucked", and that she came to "hate" working at
BOBP. Creditors were constantly calling looking for money. AGNEW
advised that BOBP made the paying of parts vendors (for vehicles),

FD-302a (Rev. 10-6-95)


29B-TP-67943


Continuation of FD-302 of ___LISA ANNE AGNEW_____ , On 4/19/05_____ , Page ___3___


and the utility bills, a priority. Other bills could potentially lag months behind. BOBP's account at Citrus & Chemical Bank was overdrawn.

In some instances, GIOVANETTI's friends, to include ROB GARCIA in Tampa, and builder BRUCE CARROLL in Bartow, would float money to BOBP, only to be paid back by BOBP a few days later. AGNEW described this as merely an exchange of checks.

Because of the above, AGNEW advised that BOBP was in dire need of cash. AGNEW advised that LITTLEJOHN conveyed this to GIOVANETTI on what seemed like a daily basis. This situation, in AGNEW's opinion, ultimately led to the conspiring of GIOVANETTI, LITTLEJOHN, and ROTH, to facilitate the schemes described as "fraudulent set-ups", and selling vehicles "out-of-trust", to maintain cash flow for BOBP.

AGNEW advised that she became aware of the schemes when she was instructed by LITTLEJOHN to fax old titles to SUNTRUST BANK in Atlanta, Georgia, representing that vehicles were newly acquired by the dealership, when in fact that were merely old deals from years prior ("fraudulent set-ups"). If vehicles were floored by 2:00 p.m., SUNTRUST would have the monies in BOBP's account at Citrus & Chemical Bank same day. Further, LITTLEJOHN began post-dating vehicle sales (with the knowledge of GIOVANETTI and ROTH), so that BOBP would not have to make payment to SUNTRUST within the stipulated ten business days (believed to actually be five business days), thus creating "out-of-trust" sales. The out-of-trust sales became progressively worse, according to AGNEW, and sometimes ran as high as $600,000 to $700,000.

Further, AGNEW advised that used vehicles were never floored at what BOBP paid for them, rather, they were always inflated to book value, usually $2,000 to $3,000 higher than what was paid.

According to AGNEW, when LITTLEJOHN wrote up a Vehicle Funding Sheet to submit to SUNTRUST, it was not legitimate, because she herself handled that function for BOBP. "Going to the closet" became standard terminology, AGNEW advised, for locating an old, prior year deal (stored in a closet on the second floor of BOBP), and re-flooring the vehicle at SUNTRUST. AGNEW advised that she herself pulled old files for just such purposes, under the instruction of LITTLEJOHN and ROTH. AGNEW indicated that GIOVANETTI frequently told her that she "needed to get some money in the

. .APR-21-2005  12:39        FBI LAKELAND                      863 683 4894      P.05

FD-302a (Rev. 10-6-95)

29B-TP-67943

Continuation of FD-302 of ___LISA ANNE AGNEW_____ , On 4/19/05_____ , Page ___4___

bank", which AGNEW interpreted as her cue that more "set-ups" were
necessary. AGNEW advised that she would bring back files pulled
from the closet to her desk area, make a copy of the vehicle title,
and re-floor the vehicle. AGNEW advised that she only went to the
closet if LITTLEJOHN was not at BOBP, otherwise, LITTLEJOHN would
go himself. AGNEW advised that TAMMY BURTON was instructed to go to
the closet as well.

AGNEW advised that vehicles that had been re-floored
would have an "RF" (for re-floored) insignia on the outside of the
file jacket, to prevent the vehicle from being re-floored again a
second time. Further, LITTLEJOHN kept records on his computer of
the vehicles that had been fraudulently re-floored, and sold out-
of-trust. When shown copies of documents labeled "Fraudulent Set-
Ups", and "Sold Out-of-Trust", AGNEW indicated that the documents
came from LITTLEJOHN's computer.

AGNEW advised that GIOVANETTI reviewed all the schedules
prepared on a monthly basis, and definitely knew what was going on.
AGNEW reiterated that GIOVANETTI would ask her frequently "Did you
floor anything?" AGNEW believes that LITTLEJOHN was more than
likely instructed to perpetrate the schemes by GIOVANETTI and ROTH,
and the three had frequent behind-closed-doors meetings.

AGNEW indicated that the auditing firm, DATASCAN, never
pulled the file jackets, and only looked in the invoice book, which
contained the bogus invoices designed to fool DATASCAN. Had they
merely requested to view a file jacket, AGNEW advised that the
scheme would have unraveled. DATASCAN came out to BOBP almost like
clockwork, every thirty days, unknowingly allowing the scheme to
proliferate. LITTLEJOHN, according to AGNEW, updated the computer
daily for the bogus deals.

AGNEW advised that the schemes unfolded, to her
knowledge, when SUNTRUST executives reviewed Vehicle Funding
Reports and located a vehicle allegedly recently sold to executive
JOSEPH LOSCH, when the vehicle was actually sold two years prior.
AGNEW also mentioned a vehicle allegedly sold to an individual by
the name of EVELYN LEWIS.

AGNEW indicated that she went to LITTLEJOHN and ROTH on
several occasions voicing her opinion as to the activities being
undertaken in regard to the schemes. No action was ever taken by
LITTLEJOHN or ROTH in regard to her comments. Further, AGNEW
advised that she frequently told GIOVANETTI BOBP had cars they

APR-21-2005  12:39       FBI LAKELAND                         863 683 4894       P.06

FD-302a (Rev 10-6-95)

29B-TP-67943

Continuation of FD-302 of ___LISA ANNE AGNEW_____ ,On _4/19/05_____ ,Page __5__

needed to pay off. AGNEW advised that she had to have her job,
however, and never took her concerns outside of BOBP. AGNEW turned
in her notice in February, 2004, only to have GIOVANETTI offer her
a pay raise to stay, which she accepted. However, AGNEW advised
that GIOVANETTI, LITTLEJOHN, and ROTH knew that she would never
cover-up anything, and always would be truthful if confronted.
AGNEW advised that GIOVANETTI always told her that things would be
better when they (BOBP) got the new place on US 98, that things
would be okay then.

     In regard to the Receiver, KEN ROSENFIELD, showing up at
BOBP on October 6, 2004, AGNEW advised that the Accounting staff
was told by GIOVANETTI and LITTLEJOHN not to answer any questions
whatsoever, and to direct any inquiries to GIOVANETTI. AGNEW
advised that she later learned (through interview by ROSENFIELD)
that GIOVANETTI had informed ROSENFIELD that the Accounting staff
had walked out on him (GIOVANETTI), which she said was a lie.

     Separately, in regard to property held by GIOVANETTI and
ROTH, AGNEW advised that the two jointly owned the J&K RANCH in
Wachula, Florida. The property allegedly encompassed 135 acres, and
was sold last summer. The two made money from the sale, and
GIOVANETTI initially deposited approximately $100,000 into BOBP's
corporate account, only to take it back out within approximately
one month.

     AGNEW has not spoken to anyone from BOBP since leaving in
February, 2005. AGNEW was asked to stay on until this late date by
SUNTRUST. In previous conversations with LITTLEJOHN, who allegedly
lives in the Imperial Lakes subdivision in south Lakeland,
LITTLEJOHN informed AGNEW that GIOVANETTI had called him on several
occasions to get their story straight. On one occasion, GIOVANETTI
allegedly instructed LITTLEJOHN and ROTH to meet him at his
residence to assist in moving various four wheelers and motorcycles
to an unknown location, so that the bank couldn't find them. AGNEW
advised that she was told by LITTLEJOHN that the items were being
moved to BRUCE CARROLL's residence.

     Finally, AGNEW advised that other individuals that agents
may wish to talk to would include CHUCK LOVETT, JR. (no culpability
per AGNEW), a former Sales Manager at BOBP now working at CENTRAL
PONTIAC in Winter Haven, Florida, and HENRY McCLERNAN (no
culpability), the former Parts Manager for BOBP now working at
Bartow Chevrolet in Bartow, Florida.

APR-21-2005  12:39          FBI LAKELAND                    863 683 4894      P.07

FD-302a (Rev 10-6-95)

29B-TP-67943

Continuation of FD-302 of ___LISA ANNE AGNEW_____ , On _4/19/05_____ , Page __6__

        AGNEW advised that she would make herself available for
further interview, if necessary, and could be reached at either of
the numbers previously provided. AGNEW would also make time for
investigators to review documents held in the custody of Receiver
ROSENFIELD, currently stored in Bartow.

                                                        TOTAL P.07