UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**JOHN C. GIOVANETTI,**

        **Petitioner,**

vs.                                                               Case No. 8:09-CV-2626-T-27MAP
                                                                               Crim Case No.  8:07-CR-295-T-27MAP

**UNITED STATES OF AMERICA,**

        **Respondent.**
_____/

## SUPPLEMENTAL ORDER

Previously, Ground One and Grounds Two (a)(B), (C), (D), (E), (G), (H), (I), (J), (K), and (L) were DISMISSED (CV Dkt. 35). An evidentiary hearing was unnecessary on those claims because it "plainly appear[ed] from the face of the motion and [] annexed exhibits and the prior proceedings in the case that the movant [was] not entitled to relief." *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2002). An evidentiary hearing was conducted on the remaining claims, Grounds Two (a)(A), (F), and (M). Each of these grounds raises a claim of ineffective assistance of counsel. Petitioner directs his claims against his retained trial counsel, John Fitzgibbons. Upon consideration, these claims are found to be without merit. Petitioner's motion is accordingly DENIED.

In **Ground Two (a)(A)**, Petitioner contends that his attorney failed to introduce evidence that Government witness and unindicted coconspirator Lisa Agnew committed perjury and "failed to introduce evidence that only funding forms with non-fraudulent information were faxed to SunTrust during the so called 'honeymoon period.'" Petitioner's former counsel summarized this claim as an allegation that Petitioner's trial counsel failed "to uncover the perjured testimony of Ms. Agnew" (CV Dkt. 1-2, p. 17).

The essence of this claim is premised on Petitioner's contention that Lisa Agnew perjured herself during Petitioner's trial and that his lawyer failed to demonstrate this during his cross examination of Agnew. The substance of Petitioner's contention that Agnew perjured herself and the Government knew of the perjury has been previously rejected.

In Ground One, Petitioner contended that Agnew, who worked in the accounting office at Petitioner's GMC dealership, committed perjury during trial "when she testified that she only completed one funding form on which she wrote the false information regarding a 're-floored vehicle' when, in fact, Lisa Agnew, had placed re-floored vehicles on several funding forms" (CV Dkt. 1, p. 4). Petitioner also contended that Agnew testified falsely that "she faxed the only funding form on which she had entered fraudulent information" when Littlejohn was on his honeymoon (the "honeymoon period"), after being directed to "go to the closet" by Petitioner. *Id.* Petitioner reasoned that discovery "reflected that, contrary to the direct testimony of Lisa Agnew, only funding forms with non-fraudulent information were faxed to SunTrust during the so-called honeymoon period." (CV Dkt. 1, p. 4).

First, in rejecting Petitioner's contention that the Government knowingly presented perjured testimony from Agnew, this Court determined that Petitioner's claim necessarily failed because he relied solely on his unsupported opinion that the prosecutor must have known that Lisa Agnew's testimony was false:

> As discussed, in support of his claim that the Government knowingly used Agnew's perjured testimony, Petitioner relies on what he considers to be inconsistencies between Agnew's testimony and the funding forms furnished in discovery. Petitioner argues that Agnew testified at trial that she faxed only one funding request form to SunTrust on which she placed fraudulent information, in September 2004, after being told to "go to the closet" by Petitioner.

2

Actually, Agnew testified that she faxed more than one fraudulent funding form to SunTrust, although "less than 10." (CR Dkt. 114, p. 12-13). With respect to the September 2004 form she admitted having completed, that form was completed when Littlejohn was away from the office on his honeymoon and Roth was on vacation. Agnew testified that on this occasion, Petitioner directed her to "go to the closet" and this was when she first became aware that Petitioner knew about the re-flooring scheme. And with respect to the one form she recalled having completed in September of 2004, she testified she did that "one time in September of '04." When asked if that was the only time, her somewhat equivocal response was "[t]o my knowledge that I remember, yes." (CR Dkt. 114, p. 14):

Q. And you knew at that time that the funding sheets, as I understand things, contained false and fraudulent information that was being submitted to SunTrust Bank?
A. Yes, I did.
Q. How many times did you do this?
A. Are you asking how many did I FAX?
Q. Yes, that you knew were false, had false information?
A. I can't recall how many. It's not many that I FAX'ed.
Q. More than five, more than 10, more than 15; give us a range, please.
A. Less than 10.
Q. Less than 10. And did you know at that point that you were willfully participating in a criminal act?
A. Yes, I did.
Q. You knew that you were committing a crime at that point?
A. I knew the document was fraudulent.
Q. My question was, did you know that you were committing a crime?
A. Yes.
Q. Then how many times did you complete a funding form in which you placed on the funding form false information in your own handwriting?
A. I did it one time in September of '04.
Q. That's the only time?
A. To my knowledge that I remember, yes.
Q. Do you have that funding form?
A. No, I don't.
Q. Did you look for it?
A. It was not in the stuff that we had.

At most, therefore, Petitioner demonstrates an arguable contradiction between Agnew's somewhat equivocal testimony and documents she may have authored other than in September 2004. That does not, however, establish that Agnew's testimony was in fact false.

3

As the Government accurately points out, Agnew admitted faxing false forms to SunTrust. Indeed, she testified that she prepared multiple forms to be submitted to the bank which she knew were false, identifying four documents in Government's Exhibit 2 as forms she prepared. She explained that she completed funding request forms when she purchased cars at auction or billed out vehicles, that Littlejohn would take the forms from her, add vehicles and fax them himself. These forms would have Agnew's handwriting on them. This would explain any numerical discrepancy in the number of funding request forms she admitted to having faxed, the one form she completed and faxed in September 2004, and those on which her handwriting may appear, if she admitted to having completed and faxed only one fraudulent form, as Petitioner argues.

Agnew's ability to accurately recall the events she testified to, any motives she may have had in testifying the way in which she did, and any contrary evidence in the documents she authored or prepared, were all factors the jury could have weighed in assessing her credibility. Arguable contradictions between her testimony and the documents available to the defense do not demonstrate that her testimony was in fact perjured, however. *United States v. Jones*, 614 F.2d at 82. And those contradictions certainly do not implicate the prosecutor in knowingly presenting false testimony. Simply put, Petitioner has made no showing that Agnew's testimony was actually false, or if it was false, that the Government knew that her testimony was false and presented it nonetheless. Nor does he suggest that the prosecutor or case agents were complicit in the presentation of any alleged perjured testimony.[1]

Only the knowing use of perjured testimony by the Government violates due process. *United States v. Bailey*, 123 F.3d 1381 (11th Cir. 1997). Petitioner must therefore demonstrate that the prosecutor actually knew Agnew's testimony was false and failed to take corrective action. *United States v. Brown*, 634 F.2d 819, 827 (11th Cir. 1981). It is not enough that Agnew's testimony was arguably inconsistent or contradicted by the funding forms produced in discovery and the prosecutor failed to take affirmative steps to "dispel every possible misimpression." *Id*.

Petitioner's unsupported and conclusory allegation that the Government must or should have known that Agnew testified falsely is not enough to warrant an evidentiary hearing. *See Boyd v. Allen,* 592 F.3d 1274, 1307 (11th Cir. 2010)(no evidentiary hearing necessary where petitioner cannot demonstrate specific facts that, if proven, would establish the government's knowledge of the perjury)(citing *Williams v. Griswald*, 743 F.2d 1533, 1542 (11th Cir. 1984)); *Lynn v. United States*, 365 F.3d 1225, 1238 (11th Cir. 2004)(where claims are based on unsupported generalizations, hearing is not required); *United States v. Jones*, 614 F.3d at 80 (conclusory allegations do not support request for an evidentiary hearing).

---

[1] Petitioner's request for access to Agnew's Grand Jury testimony (CV Dkt. 19) was denied (CV Dkt. 28), based on the Government's representation that she did not testify before the Grand Jury (CV Dkt. 27).

In conclusion, Petitioner's showing falls far short of establishing that Agnew's testimony was in fact false or that the Government knew that Agnew testified falsely and with that knowledge, presented it to the jury nonetheless. *See United States v. Lopez,* 985 F.2d 520, 524 (11th Cir. 1993)(witnesses' capacity to remember events, and the motives and inconsistencies in the testimony "fall far short of establishing that the government had knowledge of false testimony being presented to the jury); *United States v. Bailey*, 123 F.3d at 1395 (demonstration of nothing more than memory lapse, unintentional error, or oversight by witness not sufficient to establish that testimony actually false). Like the petitioner in *Jones*, Petitioner "has completely failed to support his claim with any evidence that there was either perjured testimony or knowing use of perjured testimony by the Government." *United States v. Jones*, 614 F. 3d at 82. Ground One accordingly fails on the merits, even if it was not procedurally defaulted.

Since Petitioner could not demonstrate that Agnew perjured herself, Petitioner's claim was reduced to whether counsel's failure to impeach Agnew fell below the range of reasonable professional competence. This contention warranted an evidentiary inquiry (CV Dkt. 35, p. 18-19):

> As for **Ground 2(a)(A)**, notwithstanding that Petitioner's claim of the knowing use of perjured testimony is without merit, his contention that his attorney was ineffective in failing to cross examine Agnew with respect to the available funding forms requires some evidentiary inquiry, particularly with respect to the "honeymoon period" in September 2004, when she testified Petitioner asked her to "go to the closet." While Petitioner's allegations of perjury fall short, his argument suggests an arguable basis on which to have cross examined and impeached Agnew regarding the number of fraudulent funding requests she prepared and faxed to SunTrust. A claim that an attorney failed to impeach a key witness with available impeachment evidence can support collateral relief. *See Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104 (2002)(failure to impeach key prosecution witness can rise to the level of ineffective assistance under certain circumstances).

(CV Dkt. 35, p. 18-19).

Petitioner acknowledged in his testimony during the evidentiary hearing that all of the funding forms he relies on to demonstrate that his attorney's cross examination of Agnew was deficient were part of pre-trial discovery and were provided to him by his attorney prior to trial. (*See* Gov. Exh. A 22). He also acknowledged that his attorney forwarded to him all of the FBI 302

Reports, including Agnew's, before trial. Petitioner explained that during Agnew's testimony, he believed that her testimony that he had directed her to "go to the closet" was inconsistent with her FBI 302 Report because there was nothing in the report about him telling her to "go to the closet." According to Petitioner, when he brought this to his attorney's attention during trial and back at the office after that day's session, his attorney told him "'Let's just leave it alone,'" that something might be produced later in the trial or forms may come up on some other date."[2]

To prevail on this ineffective assistance of counsel claim, Petitioner must show that his attorney's performance was deficient and that he was prejudiced such that there is a reasonable probability that but for his counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Certainly, a goal of cross examination is to impeach the credibility of opposing witnesses. *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir. 1983). A claim that an attorney failed to impeach a key witness with available impeachment evidence can support collateral relief. *See Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (failure to impeach key prosecution witness can rise to the level of ineffective assistance under certain circumstances).

Notwithstanding, Petitioner must overcome the strong presumption that Fitzgibbons' trial performance was reasonable. *Strickland v. Washington*, 466 U.S. at 690. He is presumed to "have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*; *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000). And where, as here, defense counsel is experienced, the presumption that his conduct was reasonable is

---

[2] This quotation is taken from the Court's contemporaneous notes of the testimony. The actual testimony will be demonstrated by an official transcript of the hearing.

even stronger.³ *See Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir. 1998).

Importantly, when counsel's trial strategy is attacked, that strategy cannot be second guessed, as "judicial scrutiny of counsel's performance must be highly deferential." *Chandler,* 218 F.3d at 1314 (quoting *Strickland v. Washington,* 466 U.S. at 689); *Van Poyck v. Fla. Dept. of Corrections,* 290 F.3d 1318, 1322 (11th Cir. 2002)("Our role in reviewing an ineffective assistance claim is not to 'grade' a lawyer's performance; instead, we determine only whether a lawyer's performance was within 'the wide range of professionally competent assistance.'")(quoting *Strickland*, 466 U.S. at 690). More specifically, tactical decisions within the range of reasonable professional competence are not subject to collateral attack, unless a decision was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983). Decisions such as calling some witnesses and not others ("the epitome of a strategic decision"), deciding whether to pursue residual doubt or another defense, and relying on a line of defense to the exclusion of others will not be second guessed, even if they proved to be unsuccessful. *Chandler,* 218 F.3d at 1315, n.15.

According to Fitzgibbons, who this Court finds to have been a more credible witness than Petitioner, he intentionally limited his cross examination of Agnew because her FBI 302 Report (Gov. Exh. B) alluded to other damaging matters in which he believed Petitioner could be implicated. He explained that Agnew had not mentioned or been asked about these matters on direct examination by the Government. He was concerned that Agnew might "blurt out" something about

---

³ Fitzgibbons was a federal prosecutor for ten years in De Moines, Iowa, Washington D.C. and Tampa. He served briefly as a state court prosecutor in Iowa. He has been Board Certified in Criminal Law since 1987. He estimates he has tried more than one hundred jury trials. He specializes in criminal defense.

those other matters, so he limited his cross examination of her.[4] According to Fitzgibbons, he and Petitioner were "very pleasantly surprised" by Agnew's testimony and that her testimony was better than expected.

While Fitzgibbons acknowledged that Agnew's statement that Petitioner told her to "go to the closet" was not in her FBI 302 Report, he explained that he cross examined her about that testimony that Petitioner told her to "go to the closet" during the "honeymoon period" and her claim that she had faxed that funding form to SunTrust, pointing out that this form had never been found. Using this, he challenged her credibility during closing argument.

This Court concludes that Fitzgibbons' cross examination of Agnew was a matter of trial tactics, was not objectively unreasonable, and that Petitioner has not overcome the presumption that his trial conduct was reasonable. Fitzgibbons' cross examination of Agnew was intentionally limited for an objectively valid reason, to avoid the potential that she would "blurt out" damaging collateral matters concerning Petitioner. This strategy will not be second guessed. And his challenge to her credibility was based on the lack of evidence confirming her claim that she had faxed a fraudulent funding form to the bank during the "honeymoon period," clearly an objectively reasonable strategy. Petitioner has not demonstrated that Fitzgibbons' cross examination was outside the wide range of professionally competent assistance and tactical decision to limit his cross examination was so "patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d at 1445.

---

[4] A review of Agnew's FBI 302 Report confirms Fitzgibbons' concerns about Petitioner being implicated in other damaging matters, including check kiting activities, falsely inflating the floored vehicles at "$2,000 to $3,000 higher than what was paid," Petitioner contacting Littlejohn "to get their story straight," and seeking assistance in relocating "four wheelers and motorcycles . . . so that the bank couldn't find them."

In **Ground Two (a)(F)**, Petitioner contends that his attorney failed "to make clear to the jury that Agnew and Burton both failed to recount to the FBI and FDLE agents" that Defendant had instructed them to re-floor vehicles during September 2004; failed to impeach government witnesses, "especially Lisa Agnew" with the existence of funding forms during the "honeymoon period" in light of her testimony that the form could not be located; and that the forms for the "honeymoon period" "disclosed no re-flooring of vehicles during the 'honeymoon period' contrary to the testimony of Lisa Agnew." (CV Dkt. 1, p. 7).

This contention in several respects mirrors Petitioner's claims in Grounds Two (a)(A) and (E).[5] Like that claim, it amounts to nothing more than unfounded hindsight criticism of Fitzgibbons' trial conduct and strategy which Petitioner has not demonstrated was objectively unreasonable. Moreover, with respect to Government witnesses Agnew and Burton, Fitzgibbons discussed their expected testimony with Petitioner in October 2007 (Gov. Exh. A 37, 38). He had furnished Petitioner with their FBI 302 reports prior to trial and discussed and confirmed with him their anticipated testimony, as well as the other evidence in the case. (*See* Gov. Exh. A 79, January 25, 2008 correspondence from Fitzgibbons to Petitioner). Fitzgibbons explained that their testimony at trial was "better than expected."

---

[5] In rejecting Petitioner's claim in Ground Two(a)(E), this Court concluded:

In **Ground 2(a)(E)**, Petitioner contends that counsel "failed to develop on cross examination the fact that Tammy Burton was inconsistent in her testimony as to whether she ever heard the defendant direct her or Agnew to 'go to the closet' and re-floor vehicle on funding forms sent to SunTrust Bank" (CV Dkt. 1, p. 7). This claim lacks merit.

Since an attorney's decision to cross examine a witness is "a tactical one well within the discretion of a defense attorney," absent a showing that counsel's cross examination would have affected the outcome of the trial, there is no prejudice under *Strickland. Fugate v. Head*, 261 F.3d at 1219. Indeed, counsel's cross examination and trial strategies are presumed to have been reasonable. Petitioner proffers no factual support demonstrating that counsel's cross examination of Burton fell below acceptable standards of reasonableness or that he was prejudiced by any claimed deficiencies in his cross examination. This claim is nothing more than a conclusory, hindsight criticism, unsupported by specific factual allegations. An evidentiary hearing on this issue is therefore not required. *Lynn v. United States*, *supra*.

9

It is apparent from his January 25, 2008 correspondence to Petitioner that Fitzgibbons went to some length to confirm that he had explained to Petitioner the strength of the Government's case, had laid out his intended trial strategy of conceding that a fraudulent scheme was perpetrated at the dealership but that Petitioner's defense was that he was not aware of it, and that Petitioner intended to testify. The follow-up meeting with Petitioner was memorialized by Fitzgibbons. (Gov. Exh. A 80). Fitzgibbons' trial conduct was entirely consistent with what he had explained to Petitioner before trial. His reliance on the strength of Petitioner's testimony cannot be said to have been objectively unreasonable.

In his testimony during the evidentiary hearing, Petitioner acknowledged that Fitzgibbons told him that Agnew, Burton, Littlejohn and Roth would be testifying against him. Further, he acknowledged that on each morning of trial, he and Fitzgibbons discussed trial strategy and an overview of the trial. His position at trial was that he knew nothing about the fraud and that these four witnesses were wrong. He acknowledges that his defense was presented through his own testimony that he did not know about the fraud. And he presents no evidence in support of this claim other than his explanation of how the testimony of Agnew was inconsistent with her FBI 302 report.

Petitioner has not demonstrated that Fitzgibbons' trial conduct was objectively unreasonable. Accordingly, this claim is without merit.

**Petitioner has not demonstrated prejudice**

To satisfy the prejudice prong of *Strickland*, Petitioner must show that Fitzgibbons' claimed deficient performance prejudiced his defense. Specifically, Petitioner must demonstrate that "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. This requires a showing that counsel's

errors were so serious as to deprive the defendant of a fair trial, a trial the result of which is reliable. *Id.* at 697.

With respect to Grounds Two (a)(A) and (F), even assuming counsel's cross examination of Agnew and Burton was objectively unreasonable, Petitioner has not demonstrated that any alleged deficiency in their cross examination prejudiced him. For deficient performance to be deemed prejudicial, Petitioner must establish that counsel's error was so serious as to deprive him of a fair trial, that is, but for counsel's alleged deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Salter v. McDonough*, 246 Fed. Appx. 623, 626 (11th Cir. 2007)(citing *Strickland v. Washington*, 466 U.S. at 687). Since an attorney's decision to cross examine a witness is "a tactical one well within the discretion of a defense attorney," absent a showing that this single instance of failure to "follow-up" on cross examination would have affected the outcome of the trial, there is no prejudice under *Strickland. Fugate v. Head*, 261 F.3d at 1219.

As his attorney had predicted before trial, the odds were against Petitioner. Indeed, it was not just the testimony of Agnew and Burton which implicated Petitioner in the fraudulent scheme. Littlejohn and Roth implicated him as well. As Fitzgibbons forewarned Petitioner:

> Despite the interviews which we have conducted as well as the extensive forensic accounting and other investigative work, the case at this point appears to be your word against a number of individuals, which is a difficult position to be in.

(Gov. Exh. A 79).

Petitioner testified at trial. He denied any knowledge of the fraudulent scheme or ever having heard the phrase "go to the closet," testimony that was contradicted by four Government witnesses. The jury disbelieved him. Accordingly, any alleged deficiencies in Fitzgibbons' cross examination of Agnew and Burton would not have affected the outcome of the trial. Where, as here, Petitioner

11

is unable to establish either prong of the *Strickland* analysis, his claims must be dismissed. *See Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995).

In **Ground Two (a)(M)**, Petitioner contends that Fitzgibbons "failed to be prepared for trial, having only met with the Defendant one time for the purpose of preparing for the trial," on the weekend before trial started. (CV Dkt. 1, p. 9). In rejecting Petitioner's claim that his attorney was not prepared for trial, this Court previously concluded:

> Finally, Petitioner alleges in **Ground 2(a)(M)** that his attorney was not prepared for trial and only met with Petitioner "one time for the purposes of preparing for the trial" on the "weekend prior to the trial starting on Monday." Petitioner's contention that his attorney was not prepared to try this case is undisputedly refuted by the record. His attorney's opening and closing statements, examination of witnesses, knowledge of the exhibits, argument on his motion for judgment of acquittal, and grasp of the facts all demonstrate that he was prepared.
>
> Further, the record demonstrates that Petitioner's counsel engaged the services on W.H. Simon & Company to review the dealership's accounting records and advanced a retainer to Elisa Blackburn to assist in reviewing the dealership's accounting records, listing her as a witness for trial (CR Dkt. 33). Petitioner's attorney corresponded with him, providing him with a summary of his investigative results concerning the pornography found on Littlejohn's computer, filed proposed jury instructions (CR Dkt. 27), proposed voir dire questions (CR Dkt. 32), a witness list (CR Dkt. 33) and an exhibit list (CR Dkt. 34). In sum, the record demonstrates that counsel was prepared, appropriately challenged the credibility of the cooperating witnesses, was well versed in the facts, presented his client's testimony in a coherent, logical sequence, and raised sound arguments in support of reasonable doubt. Petitioner's claim that he was unprepared is refuted by the record.
>
> Petitioner's claim that his attorney met with him only on the weekend before trial to prepare does not include any factual allegations demonstrating that this one meeting fell below the applicable standards of reasonableness. Accepting this contention as true, that does not support the conclusion Petitioner seemingly urges, that his attorney was not in touch with him prior to trial. The record reveals that counsel met with Petitioner at least twice, in September and November 2007, evidenced by Petitioner's written waivers of his speedy trial right (CR Dkts. 14, 21).

The evidence presented during the evidentiary hearing confirms this earlier conclusion. Moreover, it refutes Petitioner's claim that his attorney only met with him once before trial to prepare and it was too late to subpoena witnesses. The exhibits introduced into evidence at the

12

evidentiary hearing demonstrate that Petitioner and his attorney had thoroughly discussed their trial strategy, all potential witnesses, that the only defense witness would be Petitioner himself, and that it would essentially be Petitioner's word against that of the Government's witnesses.

The record now demonstrates that this claim is borderline frivolous. Indeed, Petitioner's contention that Fitzgibbons met with him only once before trial to prepare was contradicted by Petitioner's own testimony during the evidentiary hearing and the evidence introduced.[6] Further, the exhibits conclusively demonstrate that not only was Fitzgibbons prepared for trial, but that he had forewarned Petitioner that it would be a "difficult trial" and that the odds were against him. (*See* Gov. Exh. A 80).

Fitzgibbons discussed the trial and his anticipated cross examination of witnesses with Petitioner on December 22, 2007 (Gov. Exh. A 67). He met with him in his office on December 26, 2007 (Gov. Exh. A 71), spoke with him again on December 27, 2007 (Gov. Exh. A 73), on January 2, 2008 (Gov. Exh. A 73), on January 4, 2008 (Gov. Exh. A 75), on January 14, 2008 (Gov. Exh. A 76), and on January 22, 2008 (Gov. Exh. A 77). On January 23, 2008, he discussed trial strategy and Petitioner's testimony with Petitioner, explaining to him that if Littlejohn and Roth were believed, he would be convicted. As noted, he met with Petitioner and his wife on January 25, 2008 and discussed "all aspects of upcoming trial." (Gov. Exh. A 80). He spoke with Petitioner again on

---

[6] The record demonstrates that Fitzgibbons had numerous telephone, email and in person conversations with Petitioner leading up to the trial. He hired forensic experts to assist with the investigation, including a retired FBI agent. He ran background checks on the Government witnesses. He met with Petitioner, the forensic CPAs, and the case agent at the warehouse where the dealership records were stored. (Gov. Exhs. A 27, 29). It is obvious from Fitzgibbons' notes and correspondence that he spent "many, many hours" reviewing discovery. He discussed with Petitioner Petitioner's disagreement with many of the witness' statements. (Gov. Exh. A 43). He kept Petitioner advised of the trial schedule and summarized the discovery received from the Government for him. (Gov. Exh. A 48). He provided copies of research conducted into the backgrounds of witnesses Littlejohn and Roth. (Gov. Exhs. A 54, 55). He ordered background checks of witnesses Agnew and Burton. (Gov. Exh. A 60).

January 29, 2008 (Gov. Exh. A 82), on January 31, 2008 (Gov. Exh. A 85). He forwarded him a copy of an interview with prospective witness Ira Silver (Gov. Exh. A 86). He met with Petitioner in his office on February 3, 2008 and spoke with him again that day after receiving the Government's witness list (Gov. Exhs. A 88, 89).[7]

In summary, there can be no doubt that Fitzgibbons was prepared for trial, had fully investigated the Government's case, and explored all available defense theories with Petitioner. He thoroughly discussed with Petitioner the evidence against him, what the key witnesses were expected to testify to, and how damaging that testimony would be if believed by the jury. Fitzgibbons regularly communicated with Petitioner, provided him with copies of all discovery, explained the results of his investigation, discussed proposed witnesses, thoroughly discussed Petitioner's right to testify or not, and confirmed and memorialized most of those conversations in either correspondence to Petitioner or in contemporaneous notes in his file. Petitioner's contention that Fitzgibbons was not prepared for trial is refuted by the evidence.

This claim accordingly has no merit.

**Conclusion**

Petitioner has not demonstrated that his attorney's performance was deficient or that he was prejudiced by the claimed deficiencies in his trial performance. Accordingly, Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Dkt. 1) is DENIED and DISMISSED.

---

[7] Petitioner's testimony that Fitzgibbons "hurried" him out of the office on the Sunday before trial because of the Super Bowl that evening is not credible. That Fitzgibbons was in his office when the case agent delivered its witness list and exhibits demonstrates that Fitzgibbons was working in the office after Petitioner left.

## CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL *IN FORMA PAUPERIS* DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

The clerk is directed to enter judgment against Petitioner, deny any pending motions as moot, and close this case.

**DONE AND ORDERED** this __8th__ day of January, 2013.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record
Petitioner Giovanetti

15